**STATE of Missouri, Respondent,**

v.

**Roy Lee WRIGHT, Appellant.**

**No. 56644.**

Supreme Court of Missouri,
En Banc.

Oct. 14, 1974.

Rehearing Denied Nov. 12, 1974.

John C. Danforth, Atty. Gen., G. Michael O'Neal, Asst. Atty. Gen., Jefferson City, for respondent.

Carroll J. Donohue, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, for appellant.

FINCH, Judge.

This is an appeal from a judgment imposing a sentence of life imprisonment following conviction of defendant of murder in the first degree. We retain jurisdiction to decide this case on the basis of this Court's order entered April 9, 1973, following our decision in Parks v. State, 492 S. W.2d 746 (Mo. banc 1973). We affirm.

On December 4, 1968, during the course of a robbery of a restaurant in St. Louis, Mike Lograsso, the proprietor, was shot and killed. Defendant was arrested at about 10:00 a. m. on December 8, 1968, after other suspects previously arrested had said that defendant was involved.[1] He was taken by the arresting officers to the homicide office at central police headquarters where Sgt. Troupe, the officer in charge of the investigation of this homicide, was interrogating Leroy Fair, another suspect.

Without giving defendant a Miranda warning or otherwise advising him of his constitutional rights, Sgt. Troupe said to defendant, "What did you do with the shotgun?" or "Where is the shotgun?" Defendant answered, "Leroy, you know I gave you the shotgun. I don't know where it is at." Troupe then advised defendant not to make any further statements. Shortly thereafter defendant was taken by the police to the juvenile court building and turned over to the custody of the juvenile court.[2] Officers testified for the state that defendant was not questioned about the robbery or homicide at the time he was taken into custody or while he was being taken to police headquarters and that he was not interrogated at headquarters about the events other than the foregoing question directed to him by Sgt. Troupe.

After defendant had been delivered to the juvenile building, the police asked that they be allowed to interrogate him about the robbery and homicide. Permission was granted and at about 1:00 p. m., on December 9, 1968, defendant was questioned at the juvenile center. Present were Sgt. Troupe, Detective Dowd (who had arrested defendant), Richard Christman, the deputy juvenile officer, defendant's mother, and the defendant himself.[3]

At the outset of the interrogation on December 9, juvenile officer Christman told defendant that the officers present were members of the St. Louis police force. Christman then told the defendant that he did not have to make a statement; that any statement he made could be used against him; that he had the right to an attorney, including an appointed attorney if he could not afford one; that he probably would be certified for trial as an adult due to his past record;[4] and that in adult court there was the possibility of a death sentence for the crime of which he was accused. After each part of that warning, the juvenile officer asked the defendant if he understood. The defendant replied that he did, that he did not want an attorney (the officer testified that the defendant's mother left this decision up to the defendant) and that he would make a statement. In the interrogation by the police which followed (in the presence of the juvenile officer and defendant's mother), defendant confessed participation in the planning and commission of the robbery, saying he stood by the door holding a shotgun while the others entered the restaurant.

---

1. Previously reported cases involving other participants are State v. Fair, 467 S.W.2d 938 (Mo. banc 1971); State v. Tate, 468 S.W.2d 646 (Mo.1971) and State v. McKinney, 475 S.W.2d 51 (Mo.1971).

2. At the time of the commission of this offense, defendant was a 15 year old juvenile. His brief complains that the police officers, instead of taking him at once to the juvenile building, took him to police headquarters where he made the statement to Sgt. Troupe about the shotgun. The state explained this procedure on the basis that after defendant was arrested, he was asked his age and he replied that he was 17. After he had been taken to the police station, a call was made

to defendant's mother who reported that he was 15 or 16. This information was relayed to Sgt. Troupe who then had defendant taken to the juvenile building.

3. At trial Christman testified that regular juvenile court procedures permit the authorization of such interrogation when requested by the police but it is required that a juvenile officer be present at the time of the interrogation; otherwise, permission is not granted.

4. In cross-examination of Christman during a hearing on defendant's motion to suppress, there was reference to forty-two occasions when defendant allegedly was involved in the juvenile court.

Prior to the trial, there was an evidentiary hearing before the court on defendant's motion to suppress both the statement he made to Sgt. Troupe at police headquarters following his arrest on December 8 and the confession he made the following day during the interrogation at the juvenile building. Some additional evidence was heard before the trial started. The court ruled that the December 8 statement about the shotgun was not admissible because defendant had not been given his Miranda warning at that time. As a result, this statement was not admitted in evidence at the trial. However, the court held that the December 9 confession given at the juvenile center was voluntary and was admissible in evidence. The court refused to quash that confession, and testimony with reference thereto was received in evidence at the trial of defendant.

An opinion was written and adopted in Division One reversing and remanding this case on the basis that admission of defendant's confession violated the principles established in Westover v. United States, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[5] As a result of a dissent in Division, the case was transferred to the Court En Banc, where after reargument, the divisional opinion was not adopted and the case was reassigned for preparation of a new opinion. In writing this opinion, portions of the prior opinion are utilized without the use of quotation marks.

We first consider the proposition, strongly urged by defendant and the basis of which this case was ruled in Division, that the decision in Westover v. United States, supra, dictates a reversal in this case.

In Westover the petitioner was arrested by Kansas City police as a suspect in two Kansas City robberies. In addition, a report was received from the FBI that he was wanted on a felony charge in California. He was arrested during the evening and after being placed in a lineup he was booked. The Kansas City police then interrogated him that night and again throughout the following morning. Shortly before noon they notified the FBI that they were through interrogating Westover and the FBI could question him. Three FBI agents then continued the interrogation at the Kansas City police headquarters and after about 2½ hours, Westover signed separate confessions to each of two robberies about which he had been questioned. The Kansas City police had never advised Westover as to his constitutional rights but one of the federal agents testified at the trial (and a paragraph on each of Westover's confessions so recited) that the FBI agents had advised Westover that he did not have to make a statement; that any statement he made could be used against him; and that he had the right to see an attorney.

The Supreme Court reversed Westover's conviction, stating as follows:

"On the facts of this case we cannot find that Westover knowingly and intelligently waived his right to remain silent and his right to consult with counsel prior to the time he made the statement. At the time the FBI agents began questioning Westover, he had been in custody for over 14 hours and had been interrogated at length during that period. The FBI interrogation began immediately upon the conclusion of the interrogation by Kansas City police and was conducted in local police headquarters. Although the two law enforcement authorities are legally distinct and the crimes for which they interrogated Westover were different, the impact on him was that of a continuous period of questioning. There is no evidence of any warning given prior to the FBI interrogation nor is there any evidence of an articulated waiver of rights after the FBI commenced its interrogation. The record simply shows that the defendant did in

5. Reported in the same opinion as Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966).

fact confess a short time after being turned over to the FBI following interrogation by local police. Despite the fact that the FBI agents gave warnings at the outset of their interview, from Westover's point of view the warnings came at the end of the interrogation process. In these circumstances an intelligent waiver of constitutional rights cannot be assumed.

"We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings. A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them. But here the FBI interrogation was conducted immediately following the state interrogation in the same police station—in the same compelling surroundings. Thus, in obtaining a confession from Westover the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation. In these circumstances the giving of warnings alone was not sufficient to protect the privilege." 384 U.S. 1. c. 495, 86 S.Ct. 1639.

It is to be noted from the above that the Supreme Court concluded that Westover did not knowingly and intelligently waive his right to remain silent and that the confession, coming as it did during what the court concluded was simply an extension by the FBI of the police interrogation, resulted from the pressure applied by the local in-custody interrogation. That is not the situation in this case. Instead of 14 hours of interrogation by the local police which occurred in Westover, we have only a single question asked by the local police officer when the defendant was brought into the room where the officer was interrogating Leroy Fair. That con-

stituted the complete police interrogation of this defendant. He was then taken to the juvenile headquarters and turned over to juvenile authorities. His confession came the following day while he was in the juvenile building in the presence of the juvenile officer and his mother after he had been fully advised as to his constitutional rights by the juvenile officer. There was no evidence of any interrogation preceding this interview in the juvenile building other than the single question asked by Sgt. Troupe about what defendant had done with the shotgun.

We hold that what occurred comes within the exception recognized in the Supreme Court's opinion in Westover when they stated that they did not suggest that authorities are precluded from questioning an individual simply because he was held earlier by other authorities and interrogated by them without appropriate warnings. Here the defendant had been taken over by the juvenile authorities and was in their custody and in their building. He was questioned only after he was adequately advised of his rights and given an opportunity to exercise them. A reversal is not dictated by Westover.

In connecton with this matter of the effect of the interrogation by Sgt. Troupe at police headquarters on December 8, defendant also claims that the confession of December 9 must be excluded on the basis of the doctrine about the effect of letting the cat out of the bag which is enunciated in United States v. Bayer, 331 U.S. 532, 540, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654 (1947) in these words:

"Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as the fruit of the first."

It is defendant's contention that he let the cat out of the bag as to his guilt in this matter by his remark in the presence of Sgt. Troupe and Leroy Fair about the shotgun and that his subsequent confession was the fruit of that improper interrogation by Sgt. Troupe.

We disagree with this contention. In the first place, in Bayer, one Radovich made a confession on September 5 or 6, 1944, at a time when he was under arrest and was confined in the psychopathic ward in the station hospital at Mitchell Field. He was denied callers, communications and various other facilities at that time. Thereafter, on March 15 or 17, 1945, he was questioned by an agent of the FBI. After being given adequate warning, he again confessed to the matter with which he was subsequently charged. At that time he was still at Mitchell Field but only under administrative restrictions which meant that he could not leave the base without leave.

At this trial, the first confession by Radovich was not offered or received in evidence (the court in its opinion assumes that confession to have been inadmissible). However, the second confession was received in evidence and Radovich was convicted. The court of appeals reversed the conviction on the basis that this second confession was "patently the fruit of the earlier one" and hence inadmissible. The Supreme Court, after making the foregoing statement about the effect of letting the cat out of the bag, went on to say, l. c. 540, 67 S.Ct. 1398:

"But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed. The *Silverthorne* and *Nardone* cases, relied on by the Court of Appeals, did not deal with confessions but with evidence of a quite different category and do not control this question. The second confession in this case was made six months after the first."

The court then went on to rule that admission of the second confession was not error.

Defendant's brief also cites and relies upon the cases of Gilpin v. United States, 415 F.2d 638 (5th Cir. 1969) and Harney v. United States, 407 F.2d 586 (5th Cir. 1969). In both of those cases, the Court of Appeals held confessions inadmissible on the basis that they were the products of prior improper interrogation without adequate warnings, relying on Westover and Bayer. However, both cases recognize that the Supreme Court in Westover pointed out that when there are multiple confessions, statements given after appropriate warnings are not necessarily rendered inadmissible by a lack of proper warning before earlier in-custody statements and that the factual situation in each particular case must be examined in order to determine whether earlier unconstitutional conduct makes inadmissible the subsequent statement after proper warning. For example, in Harney, 407 F.2d l. c. 589, the Court said:

"In Westover v. United States, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court made clear that prior custodial interrogation without proper warnings does not automatically make inadmissible subsequent in-custody statements given during interrogation after appropriate warning. Instead the facts and circumstances must be examined on an ad hoc basis to determine the existence of, and extent of, a causal relationship between on the one hand the earlier, unconstitutional conduct (and the statement which is a product thereof if a statement was made) and on the other hand the statement made later. Evans v. United States, 375 F.2d 355 (8th Cir. 1967); United States v. Knight, 395 F.2d 971 (2d Cir. 1968); United States v. Pierce, 397 F.2d 128 (4th Cir. 1968); cf. Wong Sun v. United States, supra."

Likewise, in the cases of United States v. Knight, 395 F.2d 971 (2d Cir. 1968) and United States v. Hale, 397 F.2d 427 (7th Cir. 1968), the Court recognized that an ad hoc determination of admissibility based on totality of the circumstances is required in each case. In both of these cases, the Court determined that a later confession, made after proper warning, was properly admitted in evidence even though there had been earlier interrogation in which some information was obtained without adequate warning to the suspect.

Applying the rule announced in the foregoing cases, we note that here the second interrogation occurred at a different time and place (the following day at the juvenile building instead of police headquarters) and that it was attended by the defendant's mother and the juvenile court officer as well as police officers so that the nature of the setting in which the interrogation occurred was quite different than that of the preceding day. The evidence does not indicate that the December 9 statement was coerced by the question and answer on December 8.

In addition, the statement by defendant on December 8 in response to Sgt. Troupe's question about the shotgun was not a confession. Defendant did not say that he was at the restaurant at the time of the robbery and the shooting or that he had participated in either the planning or execution thereof. He did not even identify any particular shotgun or when or where he gave it to Leroy Fair. This single statement to Leroy Fair (in response to the question by Sgt. Troupe) that he had given the shotgun to Leroy and didn't know where it was would not have been

enough to make a submissible case against this defendant.[6] That being true, it follows that defendant did not by that statement on December 8 confess or let the cat out of the bag. He is not entitled to have the December 9 confession excluded on the basis that he did.

■ The second issue for resolution is defendant's contention that his motion to suppress his confession of December 9 should have been sustained and evidence thereof excluded on the basis that its use in other than juvenile court proceedings is prohibited by § 211.271(3) RSMo 1969, V.A.M.S.[7] In resolving that question, we must ascertain the meaning of the statute. In so doing, we undertake "to ascertain the lawmaker's intent, from the words used if possible; and to put upon the language of the legislature, honestly and faithfully, its plain and rational meaning and to promote its object, and the 'manifest purpose of the statute, considered historically' * * *." Cummins v. Kansas City Public Service Commission, 334 Mo. 672, 66 S.W.2d 920, 925 (banc 1933). Another well established rule of statutory construction is that a statute must be construed in the light of what it seeks to remedy and in light of the conditions obtaining at the time of its enactment. Haynes v. Unemployment Compensation Commission, 353 Mo. 540, 183 S. W.2d 77 (1944). Accordingly, it is proper to consider the case law on the admissibility of statements by the juvenile to the juvenile officer prior to the time the legislature acted to amend § 211.271(3).

Prior to amendment in 1969, § 211.-271(3) RSMo 1959, V.A.M.S., provided as follows.

---

6. Defendant's brief asserts that there was no evidence in the case of his involvement in the robbery other than his confession of December 9. He points out that Claude Johnson, the State's only eyewitness, although mentioning a Roy Wright as having been at the scene of the robbery, twice stated that the Roy Wright to whom he referred was not in the courtroom at the time of the trial (although the defendant admittedly was seated at that very

time at the counsel table with his attorney). The statement of December 8 plus Johnson's testimony would not have made a submissible case. In contrast, defendant recognizes that his December 9 confession, plus Johnson's testimony, made a submissible case. He does not question submissibility on this appeal.

7. All statutory references are to RSMo 1969 unless otherwise indicated.

"3. Evidence given in cases under sections 211.011 to 211.431 is not lawful or proper evidence against the child for any purpose whatever in a civil, criminal or other proceeding except in subsequent cases under sections 211.011 to 211.431."

In State v. Arbeiter, 408 S.W.2d 26 (Mo.1966), frequently referred to as Arbeiter (1), a conviction of first degree murder was reversed because of the admission in evidence of statements of defendant (a 15 year old juvenile at the time of the offense) made to police after they took him into custody. Instead of turning defendant over to juvenile authorities as soon as he was taken into custody as directed by § 211.061, the police took him to police headquarters and questioned him extensively, obtaining the statement which was introduced in evidence. In deciding the case, the court did not rule upon § 211.271(3) RSMo 1959, V.A.M.S., other than to say:

"We reject appellant's contention that subsection 3 of § 211.271, by its terms, renders inadmissible statements resulting from police questioning from the moment that a child is taken into custody. The prohibition of that section is against the use of evidence given in juvenile court *cases* against the child in criminal proceedings. The statements here in question were not 'evidence given' in a juvenile court case." 408 S.W.2d l. c. 29.

Thereafter in State ex rel. Arbeiter v. Reagan, 427 S.W.2d 371 (Mo. banc 1968), known as Arbeiter (2), the court considered whether to prohibit the circuit judge from enforcing an order for a subpoena duces tecum for production of juvenile court records so as to permit inspection and copying by the circuit attorney. The motion seeking the subpoena alleged a belief that Arbeiter had made statements and admissions to juvenile court personnel concerning the murder which would be disclosed by the file and which would be admissible in evidence.

In declining to prohibit the circuit judge, the court held that after a juvenile court has relinquished its jurisdiction over a juvenile to a circuit court, the latter has the power and authority to open juvenile files and records for inspection "by persons having a legitimate interest therein". The circuit attorney was held to be such a person. The court reserved for later consideration the admissibility of information which might be obtained from the juvenile court file. However, a concurring opinion, approved by three judges, suggested that if a juvenile made a voluntary confession after being given all required constitutional warnings and rights, such confession might be admissible in a criminal trial even though that same information had been used in the juvenile proceedings. A dissenting opinion took the position that § 211.271(3) as it then existed gave the juvenile the substantive right not to have used against him any information obtained from him during the juvenile proceedings. Thus, as matters stood after this decision, it was not settled whether under some circumstances a statement by the juvenile to juvenile court personnel could be used in a later criminal trial.

Against the background of the decisions in Arbeiter (1) and (2) and the uncertainty as to admissibility of statements obtained by juvenile officers in the juvenile court proceedings, the General Assembly in 1969 amended § 211.271(3) to provide as follows:

"3. After a child is taken into custody as provided in section 211.131, all admissions, confessions, and statements by the child to the juvenile officer and juvenile court personnel and all evidence given in cases under this chapter, as well as all reports and records of the juvenile court, are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, other than proceedings under this chapter." [8]

8. Laws 1969, p. 353, § 1. During oral argument counsel stated that the foregoing was generally known as the Arbeiter Amendment.

The key words in this amended statute insofar as this case is concerned are that "all admissions, confessions, and statements by the child to the juvenile officer and juvenile court personnel * * * are not lawful or proper evidence against the child * * * in any proceeding * * * other than proceedings under this chapter."

Defendant argues that the General Assembly by the foregoing language intended to establish an absolute prohibition to admission in evidence in a criminal trial of any statement to or in the presence of a juvenile court representative regardless of circumstances. Pointing out that this statute makes no reference to interrogation by police, to the presence of a parent, to the giving of constitutional warnings or to the circumstances of the interrogation, he contends that it is not permissible for the court to consider any of these matters in determining the admissibility of any admission, confession, or statement made by the juvenile during the period he is subject to the jurisdiction of the juvenile court (a period which begins immediately upon his being taken into custody). Sec. 211.061; Arbeiter (1), supra. In other words, he argues that § 211.271(3) is a complete and unconditional bar to the use against him in criminal cases of any statement he makes during this period of time.

■ We reject defendant's interpretation of amended § 211.271(3). In our view the specific reference in the amended statute to statements, admissions and confessions made to juvenile officers and juvenile court personnel, considered in the light of the decisions in Arbeiter (1) and (2), indicates that the amendment was adopted to answer the question left open by Arbeiter (1) and (2) with reference to admissibility of statements such as those made by Arbeiter to his juvenile officer. It expressed a legislative intent that juvenile court personnel should not be permitted to utilize the relaxed, parens patriae relationship existing between them and a youth to secure a statement or confession of a

crime and then use it against him in a prosecution under the general criminal law.

If the General Assembly had intended, regardless of circumstances and of persons present and participating, to completely insulate juveniles from giving statements or confessions usable in criminal trials so long as the juvenile remains subject to juvenile court jurisdiction, we think it could and would have clearly so stated. In that event, instead of limiting the amendment to statements or confessions to juvenile officers or other juvenile court personnel, the statute would have stated simply that any admission, confession or statement taken by anyone from a juvenile subject to juvenile court jurisdiction would be inadmissible in any proceeding other than one in the juvenile court itself.

If defendant's position were adopted, it would mean that until the juvenile court relinquished jurisdiction by certifying the youth for trial as an adult, no one could interrogate him for purposes of criminal prosecutions, regardless of such things as the seriousness of the crime, the juvenile's past record, the persons present to safeguard and preserve the juvenile's rights, the nature and tone of the interview (whether adversary or friendly and relaxed), and the steps actually taken to advise the juvenile as to his rights and the potential use of any statements made. This is not what the statute says, and we conclude is not what the General Assembly intended by the amendment it adopted. As we said in construing this same section of the statute in State v. Richardson, 495 S. W.2d 435, 440 (Mo. banc 1973), "We are bound by what the General Assembly said, not what it might have said. The language of § 211.271(3) is clear and explicit."

The question then is whether the confession made by this defendant on December 9 was made to juvenile officer Christman within the contemplation of § 211.271(3). We conclude that it was not. This was not a relaxed conversation between the ju-

venile officer and the youth wherein the latter was confiding in the juvenile officer after he was told that he was among friends who wanted to help him by supervision and care under direction of the juvenile court. Rather, defendant was told that the officers present to question him were from the police department. He was told that in view of his past record he probably would be prosecuted under the criminal laws as an adult. He was told that he could receive the death penalty (this was before the decisions which eliminated the death penalty as a possibility under then existing Missouri statutes). He was told that he would not have to make any statement and that anything he said could be used in court against him. His mother was present and they both were told that defendant had the right to be represented by an attorney, including an appointed attorney if necessary. The decision on this was left to the boy by his mother, and he indicated he did not want an attorney. He then was questioned by the police officer, not the juvenile officer. We conclude and hold that this was a statement to the police officer and therefore not within the provisions of § 211.-271(3). The mere presence of the juvenile officer to warn the youth of his rights and to make sure that they were accorded to him, when all the facts and circumstances are considered, did not make the confession to the police officer a statement to the juvenile officer.

In addition to relying on amended § 211.271(3), defendant also cites and relies upon Harling v. United States, 111 U.S. App.D.C. 174, 295 F.2d 161 (1961) which adopted a per se exclusionary rule on the basis that principles of fundamental fairness preclude use in criminal cases of damaging statements or confessions made by juveniles before the juvenile court has surrendered its exclusive jurisdiction. In State v. Sinderson, 455 S.W.2d 486, 493

(Mo.1970) this court, in discussing Harling and State v. Maloney, 102 Ariz. 495, 433 P.2d 625 (1967), said:

"The court in Arbeiter (3) did not purport to adopt an absolute bar (as in Harling and Maloney) to any statement made by a juvenile while within the exclusive jurisdiction of the Juvenile Court. We conclude now that we should not adopt such a rule. Rather, in the absence of any statute providing otherwise, we agree with the view expressed by the Supreme Court of Oregon in State v. Gullings, 244 Or. 173, 416 P.2d 311, 313, when it said: 'Presuming that federal constitutional Fifth and Sixth Amendment rights are granted, we believe that an absolute prohibition is not required so long as it is made clear to the juvenile that criminal responsibility can result and that the questioning authorities are not operating as his friends but as his adversaries.' " [9]

The rule in Sinderson was reaffirmed in State v. Stevens, 467 S.W.2d 10 (Mo. 1971).[10]

■ Having concluded that the 1969 amendment of § 211.271(3) did not adopt an absolute prohibition against use of every statement obtained from the juvenile while subject to juvenile court jurisdiction, we reaffirm the rule announced in Sinderson, modified only to the extent required by the 1969 amendment. Restated, that rule is that if, after he has been granted his federal constitutional Fifth and Sixth Amendment rights, a juvenile subject to jurisdiction of the juvenile court makes a voluntary statement to someone other than a juvenile officer or other juvenile court personnel, and if it is made clear to the juvenile that criminal responsibility can result from any statement he makes and that the questioning authorities are operating as his adversaries rather than his friends,

---

9. Arbeiter (3) referred to in this quotation is the case of State v. Arbeiter, 449 S.W.2d 627 (Mo.1970).

10. Another recent case adopting the rule expressed in Gullings and Sinderson is State v. Loyd, 212 N.W.2d 671 (Minn.1973).

such statements are admissible in evidence against the juvenile in a criminal trial.

The rule we adopt does not make juvenile proceedings a mere adjunct to the criminal process nor nullify the juvenile code or its effectiveness. Sec. 211.061 requires that immediately after being taken into custody, the juvenile shall be taken before the juvenile court or delivered to the juvenile officer or person acting for him. Compliance with that statutory requirement protects the juvenile against interrogation before such delivery. Arbeiter (1), supra. Thereafter, the juvenile is subject to jurisdiction of the juvenile court and whether he is interrogated by other than juvenile court personnel depends on whether permission is granted for such interrogation by juvenile court personnel. In most juvenile proceedings, this question will not arise. Where it does not, any statement made will be to the juvenile officer or other juvenile court personnel and under § 211.271(3) will not be usable other than in the juvenile court. In more serious crimes, a request by police personnel to interrogate may well be made. When it does, a decision will be made by juvenile authorities, based, no doubt, on the nature and seriousness of the alleged offense, the record and history of the juvenile himself, and other pertinent facts and circumstances. If questioning is permitted, the juvenile authorities are in a position, as here, to see that the juvenile's rights are fully explained and protected, that he understands those rights, and that he is aware of the potential consequences of any statement he may make. Use in criminal trials of voluntary statements made under such circumstances will not violate any confidence or undermine or destroy the parens patriae relationship existent when only the juvenile and juvenile court personnel are involved.

▇ Defendant's third contention is that the court "erred in refusing to hold an evidentiary hearing outside the presence of the jury on the question of whether defendant's statements of December 9, 1968 were made voluntarily, because such hearing is a constitutional condition to the admission of testimony as to self-incriminating statements and had not been held prior to defendant's trial."

The transcript discloses that on October 23, 1969, defendant filed two motions in which he sought to suppress his statements of December 8 and 9, 1968. An amended motion was filed December 8, 1969, and a hearing thereon at which testimony was taken was held December 9, 1969. At the conclusion of that hearing, Judge Kirkwood ruled that the motion should be passed on by the trial judge. Consequently, he set aside the submission and reassigned the cause to Division 16.

Subsequently, on June 5 and 8, 1970, hearings on defendant's motion to suppress were held before Judge Palumbo in which Judge Palumbo had before him the testimony taken before Judge Kirkwood plus additional evidence and extensive argument of counsel. Judge Palumbo sustained the motion to suppress the December 8 statement but overruled it as to the December 9 statement. He filed a memorandum opinion in which he made detailed findings and conclusions including an express finding that the statement of December 9 was voluntary and was not procured by coercion, threats, or fear and was not induced by promises of leniency.

When the case was reached for trial, defendant filed additional motions to suppress, asserting among other things that Judge Palumbo had not ruled on certain grounds asserted. Judge Holt gave counsel the opportunity to and he did offer additional evidence, after which the motions were overruled.

We conclude that what occurred is sufficient to comply with Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) and Sims v. Georgia, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967). The court with unmistakable clarity found the December 9 statement to be voluntary and hence admissible.

■ Although not included in his third assignment nor in his motion for new trial, defendant in argument complains as to Instruction No. 5 whereby the issue of voluntariness was submitted to the jury under the Missouri procedure which is in accord with the so-called Massachusetts practice approved in Denno. No issue with reference to that instruction is preserved for appellate review.

■ Defendant's fourth assignment relates to allegedly prejudicially erroneous closing argument on behalf of the state. It recites that the assistant circuit attorney argued "that correction of the defendant was the jury's duty to prevent crime in the City of St. Louis, protect the public from crime, and from the dangerous propensities of defendant." He argues that the comments objected to were not supported by the evidence, were irrelevant and tended to prejudice and inflame the jury against defendant.

■ In the first place, we note that in his motion for new trial, defendant's only complaint with reference to said argument was that "The Court erred in permitting the Assistant Circuit Attorney * * * in his closing argument, over objection, to make generalized statements about crime in the City of St. Louis, and the jury's opportunity to do something about it." Without further lengthening this already rather long opinion by detailing the specific statements discussed in defendant's brief, we observe that we have considered them in the light of the generalized allegation in the motion for new trial and the various cases cited and have concluded that reversible error is not shown. The trial court has considerable discretion in allowing or rejecting particular argument to the jury. We do not find that the trial court abused that discretion.

■ Finally, defendant complains of the admission in evidence of a double-barreled shotgun as an exhibit in the case. We overrule this assignment. The gun was identified as one which had been in the possession of some of the participants in the robbery on the day it occurred. There was a shotgun at the restaurant when the robbery occurred. Witness Claude Johnson testified that one McKinney was holding the shotgun. Defendant, in his confession, said that someone handed him a shotgun and that he stood at the door, holding that gun. Afterwards, he delivered it to Leroy Fair. Some of the boys took the gun to the home of Verbie West after the robbery and shooting, where it was found a few days later. There was ample evidence to justify admitting this gun in evidence.

Judgment affirmed.

MORGAN, HOLMAN and HENLEY, JJ., concur.

DONNELLY, C. J., dissents in separate dissenting opinion filed.

SEILER, J., dissents in separate dissenting opinion filed.

BARDGETT, J., dissents and concurs in separate dissenting opinion of SEILER, J.

DONNELLY, Chief Justice (dissenting).

The principal opinion adopts the rule "that if after he has been granted his federal constitutional Fifth and Sixth Amendment rights, a juvenile subject to jurisdiction of the juvenile court makes a voluntary statement to someone other than a juvenile officer or other juvenile court personnel, and if it is made clear to the juvenile that criminal responsibility can result from any statement he makes and that the questioning authorities are operating as his adversaries rather than his friends, such statements are admissible in evidence against the juvenile in a criminal trial."

The opinion then holds that if a request to interrogate is made by police personnel,

"a decision will be made by *juvenile authorities*, based, no doubt, on the nature and seriousness of the alleged offense, the record and history of the juvenile himself, and other pertinent facts and circumstances." (Emphasis mine.)

I find nothing in Chapter 211 which, expressly or by implication, gives authority to *juvenile authorities* to make such a decision. Section 211.151, RSMo 1969, V.A.M.S., provides that "[n]either fingerprints nor a photograph shall be taken of a child taken into custody for any purpose without the consent of the juvenile judge." Can it be seriously argued that a confession is potentially less damaging to a juvenile accused than his fingerprints or photograph? I think not. And yet, the principal opinion authorizes juvenile officers, *without approval of the juvenile judge*, to permit a juvenile to utter words or sign statements which will be admissible to convict him if he is later certified for trial as an adult.

The principal opinion evidences a distaste (which I share) for attempting to embrace within the parens patriae concept the older, hardened, knowledgeable recidivist, who, solely because he is under seventeen years of age, passes through our juvenile courts, and, by his presence there and the revulsion he generates, threatens to destroy the Juvenile Court system. But, what of the others?

I respectfully dissent.

SEILER, Judge (dissenting).

I respectfully dissent. The majority opinion's erroneous construction of Sec. 211.271(3) in the three cases decided today, State v. Wright, State v. Rone, Mo., 515 S.W.2d 438 and State v. McMillian, Mo., 514 S.W.2d 528, produces the following non-sequitur:

1. A confession obtained by the police while the juvenile is in their custody is not admissible against the juvenile in a subsequent criminal proceeding, under the first Arbeiter case, 408 S.W.2d 26 (Mo.1966) and Sec. 211.061.

2. A confession obtained by the juvenile authorities while the juvenile is in juvenile custody is not admissible against the juvenile in a subsequent criminal proceeding, under the express prohibition of Sec. 211.271(3).

3. But when the police and the juvenile authorities get together in the same room with the juvenile, either at the police station (the Wright case) or at the juvenile quarters (the Rone and McMillian cases), then a confession made to the police is admissible against the juvenile in a subsequent criminal proceeding.

Not only is the above a non-sequitur; if it stands it authorizes a transparent evasion of the juvenile code and of Sec. 211.271(3) in particular. It permits the police and the friendly juvenile officer to sit around the table with the juvenile and do together indirectly what cannot be done directly.

To find the meaning of the amendment to Sec. 211.271(3), the majority opinion looks to legislative intent. Such intent can be found, it is said, by ascertaining what the amendment was seeking to remedy and the conditions obtaining at the time of enactment. By this process the majority concludes that the amendment was intended to answer the question left open by the second Arbeiter case, which was whether statements made to a juvenile officer would be admissible against the juvenile in a subsequent criminal proceeding. The legislature provided an explicit answer in the negative.

But then, having arrived at the legislative intent by using its own suggested method of analysis of ascertaining what the amendment was seeking to remedy and the conditions obtaining at the time of the enactment, the majority opinion embarks on a course of speculation as to what the general assembly would have done had it also had before it the problem of whether statements made by the juvenile to the po-

lice during the time he was in juvenile custody should be admissible in a subsequent criminal proceeding. In pursuing this speculation, the majority overlooks that it was not necessary for the legislature to go any further than it did by the amendment made to Sec. 211.271(3) to correct the problem before it, which by the majority's own analysis, pertained solely to the admissibility of statements made to the juvenile authorities.

As the court said in State v. Richardson, 495 S.W.2d 435, 440 (Mo.banc 1973), quoted in the majority opinion, "The language of Sec. 211.271(3) is clear and explicit." So it is, and it says nothing about the use or non-use of statements made to the police.

In my opinion, there is no evidence at all that the legislature intended to do anything more by the amendment to 211.271(3) than to straighten out the uncertainty caused by the second Arbeiter case, State ex rel. Arbeiter v. Reagan, 427 S.W.2d 371 (Mo. banc 1968), as to admissibility in subsequent criminal trials of statements made by juveniles to juvenile authorities.

I find substantial support for this view in the fact that the legislature made no other changes whatever in the entire juvenile code, much of which is directed at keeping police jurisdiction and juvenile jurisdiction separate and apart.

I refer to the following: Sec. 211.011, which is not mentioned or considered in the majority opinion, but which declares the purpose of the juvenile code as being "to facilitate the care, protection and discipline of children who come within the jurisdiction of the juvenile court" and states that it shall be "liberally construed" to that end; Sec. 211.061, which requires the police upon taking a child into custody to take him "immediately and directly" to the juvenile court; Secs. 211.131, 211.031 and again 211.061, which give the juvenile court exclusive jurisdiction once it obtains custody; Secs. 211.241 and 211.251, which give the juvenile court almost absolute

power over and control of the child; Sec. 211.151, subd. 2, which prohibits fingerprinting of a juvenile; Sec. 211.321 making juvenile records confidential; and Sec. 211.271, subd. 2, which provides no child can be charged with a crime until the juvenile court first considers the case and decides to relinquish jurisdiction.

All these were left unchanged, which convinces me that the legislature intended no change in the juvenile code by the amendment to 211.271(3) other than to make it clear that statements given to juvenile authorities were not later to be used against the child in a criminal case.

Had the legislature intended by 211.271(3) to work a change of such magnitude as to make admissible in subsequent criminal proceedings statements made to the police by juveniles while in juvenile custody, it would not have left it to "construction" but would have provided so in the amendment. This the legislature did not do and instead left the subject unmentioned.

Additionally, I see no indication that in closing the loophole as to statements to juvenile authorities that the legislature was intending to open, sub silencio, a loophole as to police officers. On the contrary, instead of the amendment indicating an intention to facilitate interrogation of a juvenile by the police and admission against him of his statements in a subsequent trial, the amendment allows the juvenile to confess to juvenile authorities and be certain that the confession could not be used against him by the police, something not theretofore available to him. The intent of the amendment is to insulate the juvenile from the police and to encourage free communication between the juvenile and the juvenile authorities; to protect the child, not undo him.

Returning to my analysis of the majority opinion, it holds next that statements in question were made not to the juvenile officer, but to the police, and hence not within the prohibition of Sec. 211.271(3), even

though the juvenile officer was present when the statement was made. The conclusion that the statements were admissible because they were made to the police and not juvenile officer rests on the erroneous assumption, as I have pointed out above, that in closing the loophole as to juvenile officers the legislature intended to open a loophole as to police interrogation.

The majority opinion then concludes by asserting that the new rule of permitting police interrogation does not make juvenile proceedings a mere adjunct to the police or nullify the code, inasmuch as there cannot be police interrogation prior to delivery by virtue of Sec. 211.061, and then the police would have to get permission from the juvenile authorities, who will decide, based on seriousness of the charges, past record, and "other pertinent facts and circumstances", and if they do permit police questioning, the juvenile authorities can see that the juvenile's rights are first fully explained and protected. Use of such statements in criminal trials, the majority opinion says, does not violate any confidence or undermine the parens patriae relationship.

I disagree. The position of the majority is completely unrealistic. The parens patriae relationship is certain to be undermined. To illustrate: In both cases under consideration, the juvenile is declared, at the time the police obtained their confession, to be in juvenile custody. This is necessary because under Sec. 211.061 the police are required to turn custody of the juvenile over to the juvenile authorities immediately, and under State v. Arbeiter, 408 S.W.2d 26 (Mo.1966) unless the police comply with this section, they cannot use the confession against the juvenile. In most, if not all instances, it will be the juvenile officers who receives custody of the juvenile. Under the majority opinion, the juvenile officer then is forced into a dual and conflicting role, because in order to obtain an admissible police confession, the juvenile must be in juvenile custody and at the same time in a hostile, adversary environment. While purporting to act in the best interests of the child, the juvenile officer must lend his presence to the extent needed to bring the juvenile within juvenile custody so that the police may obtain an admissible confession, which is certainly *not* in the child's best interests if the child subsequently is released to be tried as an adult. " . . . The conflict between gaining the youth's confidence at the investigative state and then prosecuting him is obvious. Even more important is the effect of this sudden reversal of conflicting roles on the youth. Instead of instilling confidence in him, the directly opposite result is frequently obtained . . . The offender feels he has been tricked, and it would be most difficult to argue against that conclusion." 56 Ill.Bar J. 320, 326.

We do not tolerate such conflicts of interest in a judge trying a case or in a lawyer representing a client. Yet it is now approved conduct for a juvenile officer dealing with children. I cannot conceive of anything which could be more destructive of the parens patriae relationship. I cannot believe the legislature meant for the juvenile officer to be put in such a position or for children to be treated that way.

The parens patriae relationship is not subject to being turned on and off like a hot and cold water faucet. The child is first placed in the relaxed, friendly, parens patriae relationship which the majority recognizes is characteristic of the juvenile court approach, and then is expected to sense, with a full appreciation of the significance which the majority opinion ascribes to it, the change to an adversary atmosphere, surrounded by adversaries, not friends. The police will commence their interrogation while the child knows he is still in juvenile custody, with the juvenile officer present or close at hand, perhaps in the presence of his parents, and while still in the same physical surroundings in the juvenile building or quarters which the child

knows are separate and apart from the general run of adult places of detention.[1]

All these factors maintain the child's sense of juvenile court protection, even while he is being questioned by the police. Thus the police have it both ways: they get the benefit of the residue of juvenile protection which is bound to remain in the child's consciousness, but anything the police extract from him is judged as though it were obtained in a true adversary setting. I find nothing in the juvenile code which permits or remotely envisions such cynical manipulation of a juvenile by either the police or the juvenile authorities.

The result of today's decisions will also involve the police more and more in the operation of the juvenile system and will force the juvenile authorities more and more into conflicts of interest, where they must sacrifice the reform and rehabilitation goals of the juvenile system to the demands (even though couched as "requests") of the police. This points up another unfortunate consequence. In numerous instances, the question of whether· the juvenile court will ultimately relinquish jurisdiction will be decided, as a practical matter, by the juvenile officer alone, who is not a judicial officer, at the time he decides to let the police interrogate the juvenile. For if the police succeed in obtaining a confession, then the juvenile court will be subject to heavy public, newspaper, police and prosecutorial pressure to relinquish jurisdiction, without regard to whether the juvenile is nevertheless a proper subject to be dealt with under the juvenile code. No doubt many juvenile judges are able to withstand such pressures, but the point is that the juvenile system is not meant to be operated so that the

police can put the juvenile officer and the juvenile judge in that position. " 'Waiver' provisions are normally not mandatory, but only permissive, leaving the decision to the discretion of the juvenile court judge . . . The decisive issue is not whether he is 'guilty' of the particular offense charged, but whether he can be benefitted by the juvenile system if he is, in fact, guilty." 12 St. Louis Univ.L.J. 424, 426. It was never contemplated that the police, the sheriff, or the FBI would be part of the juvenile court system. They are by their nature and objective antithetical to the purposes of the juvenile code. The majority opinion compels the juvenile system to try to blow hot and cold at the same time, which it cannot do and which will inevitably result in helping the police at the expense of the juvenile.

As previously pointed out, these cases turn on the meaning of the amendment to Sec. 211.271(3). As we have seen, this section says nothing about making admissible in subsequent criminal trials confessions obtained by police interrogation while the juvenile is still in juvenile custody. The rule making such confessions admissible is court made, created in the opinions handed down today. Admittedly the crimes in the three cases before us were committed by teenage juveniles, the evidence of guilt is convincing, there has been much publicity about teenage crime, and unquestionably the police believe that if they are permitted to interrogate juveniles under the auspices of the juvenile system there will be many more convictions of youthful offenders.

But I fear we have become so concerned about conviction and punishment that we forget what the true aim and purpose is of

---

1. For example, in the Wright case, the mother and the deputy juvenile officer were present. The police questioning took place in the juvenile court building, which defendant knew from previous experiences. The juvenile was age 15.

   In the McMillian case, the mother, deputy juvenile officer, and juvenile legal officer were present during the police interrogation, which

took place in the hearing room at the juvenile detention center. The juvenile was age 15.

   In the Rone case, the questioning took place in the police ·station, but the deputy juvenile officer, whom defendant knew from previous juvenile court experiences when he had been assigned to a deputy juvenile officer, released, and sent home, was present. The juvenile was either 16 or a few months short thereof.

our juvenile code. I have already made reference to Sec. 211.011, which states the primary purpose of the juvenile code. Numerous decisions of the Missouri courts have recognized that the purpose of our juvenile code is not to convict children of criminal offenses, but to safeguard and reform them. Without taking space to quote directly the language used, see, for example, State v. Arbeiter, 408 S.W.2d 26, 30 (Mo.1966); State v. Richardson, 495 S.W. 2d 435 (Mo.banc 1973); In re K.W.B., 500 S.W.2d 275 (Mo.App.1973) and In re C, 314 S.W.2d 756, 760 (Mo.App.1958).

We should remind ourselves of the words of the late Judge Michael J. Carroll, longtime able and respected juvenile judge in the City of St. Louis, 21 Journal of Missouri Bar 399, where he said: "In order to place our attention in the proper perspective, it may be well to consider what the law is not: 'The juvenile code is not criminal law. The child taken into custody is not under arrest. The juvenile court is not a criminal court. The juvenile is not charged with a crime. The juvenile court hearing is not a criminal trial . . . .' "

Thus, we as a court should realize and accept that the legislature has provided that *juveniles are to be treated differently than adults. So long as the juvenile is within the juvenile system this concept prevails.* It does not disappear and reappear depending on whether the police desire to question the juvenile or whether he has previously been in trouble or whether a "serious" crime has been committed and he is under suspicion.

But this is all forgotten in the cases before us. To allow the police to use the juvenile court system to obtain confessions for use against the juvenile at his subsequent criminal trial, with all the accompanying conflicts of interests and breaches of integrity of the juvenile system previously pointed out, is to satisfy the police at the expense of the juvenile system. In so doing, the juvenile system is made to fall short of the trust reposed and to assume the role of one "That [does] palter with us in a double sense; that keep the word of promise to our ear, And break it to our hope."

Furthermore, the majority is overlooking the fact that the juvenile code provides a method (and a prompt method) of allowing the juvenile court to relinquish jurisdiction, whereupon the juvenile can be charged and prosecuted as an adult. There is no reason why the police cannot then interrogate him.[2] It may be said that by then he will have a lawyer and hence will not talk, but this possibility has existed all along anyway. A lawyer must be offered in juvenile court and even upon arrest. The law and the courts have long since discarded the idea that a suspect or a juvenile should not be given right of counsel from the outset because to do so might result in the lawyer advising his client not to talk.

If a juvenile, in fact, wants to make a clean breast of everything, knowingly and of his own free will, there is no reason why he cannot do this just as well to the police after the juvenile court has considered the situation and decided to release him for prosecution as an adult.

In conclusion, there is one other matter which should be pointed out. It is not dealt with in the majority opinion, but it cannot be ignored and it is a compelling reason why neither the Wright, Rone, nor

---

2. *If* it is a fact that the police cannot operate without being able to question juveniles while in juvenile custody, then the matter is one to be considered by the legislature, to determine whether this police aim can be achieved and at the same time preserve the juvenile system in accord with its purpose as stated in Sec. 211.061. It is not an objective for us to accomplish by construction of a statute. What the majority opinion does is to accomplish by judicial decision what failed of enactment at the last session of the 75th General Assembly—namely, a bill which would have made admissible all admissions, confessions and statements of a juvenile, after he had been warned of his rights, H.B. 914.

McMillian confessions should be admitted against the respective defendants. The majority opinion states that the juveniles were given full and fair warnings of their rights and were made aware of the potential consequences of *any* statement they may have made. The opinion speaks of full explanation and a full and complete understanding on the part of the juvenile as a prerequisite to the kind of police interrogation under juvenile auspices which the majority opinions permit.

But was that done here? It was not. Sec. 211.271(3) provides that "all admissions, confessions, and statements by the child to the juvenile officer and juvenile . . . personnel . . . are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, other than proceedings under this chapter." The legislature has thus made it clear that a juvenile who desires to make a confession and get the matter "off his chest" (which all will agree is essential to effective reform and rehabilitation) can do so to the juvenile officer without fear that it can later be used against him in a criminal proceeding, but will be kept within the confines of the juvenile system. As put by Weintraub, C. J., concurring in In the Interest of Carlo, 48 N.J. 224, 225 A.2d 110, 121, " . . . [A] child can be rehabilitated only in the face of the truth . . . " The police, of course, would not be interested in the juvenile making this sort of confession, because then the police could not use it to convict him. It is a measure of the insincerity of the police that none of these juveniles were informed that if they wanted to confess, they could do so to the juvenile officer without risking the possibility that their confessions could be used against them in a criminal proceeding.

Nor did the juvenile officers in any of the cases advise these juveniles or their parents as to what the law allowed in case the juvenile desired to make a confession, but only to the juvenile officer. The juve-niles or their parents could not be expected to know about this important part of Sec. 211.271(3) unless someone told them about it before the juvenile confessed. But no one did. How can it be said that the juvenile was given a full and complete explanation of his rights and the potential consequence of *any* statement he might make, when he was given no hint of what he could do under the provisions of Sec. 211.-271(3)? Unless he is informed that he has the right to speak freely and openly with the juvenile officer, knowing that his statements cannot be used against him in a subsequent criminal trial, he is deprived "of the freedom to decide whether to assist the state in securing his conviction." In re Gault, 387 U.S. 1, 47, 87 S.Ct. 1428, 1454, 18 L.Ed.2d 527 (1967). Anything less leaves him with no more than the option to talk at large or remain silent, which is far less than he is entitled to under the statute.

The confession should have been ruled inadmissible and the case should be reversed and remanded for a new trial, as is true also in State v. Rone and State v. McMillian, supra.