**STATE of Missouri, Plaintiff-Respondent,**

v.

**Lansing ROSS, Defendant-Appellant.**

**No. 35318.**

Missouri Court of Appeals,
St. Louis District,
Division One.

Nov. 19, 1974.

Frederick R. Buckles, Public Defender, James C. Jones, Asst. Public Defender, St. Louis, for defendant-appellant.

John C. Danforth, Atty. Gen., G. Michael O'Neal, Asst. Atty. Gen., Jefferson City, Brendan Ryan, Circuit Atty., Henry Fredericks, Asst. Circuit Atty., St. Louis, for plaintiff-respondent.

SIMEONE, Judge.

This is an appeal by appellant, Lansing Ross, from a judgment of conviction entered March 23, 1973, following a jury verdict finding him guilty of second degree murder and assessing his punishment at 25 years in the Department of Corrections. For reasons hereinafter stated, we reverse the judgment and remand the cause for further proceedings.

On January 17, 1972, the grand jurors of the State of Missouri within and for the City of St. Louis charged appellant-defendant Lansing Ross with assaulting one Richard Johnson with a "loaded pistol" thereby inflicting a mortal wound from which Richard Johnson died on December 5, 1971. On January 24, 1972, Ross was arraigned and pleaded not guilty. A "motion to suppress statements" was filed on March 15, 1972. The motion was overruled and trial began on January 23, 1973. The jury returned a verdict of guilty of "Murder in the Second Degree as charged and assess-[ed] his punishment at 25 years."

The points on appeal concern the admissibility of certain out-of-court statements made by appellant-Ross, and certain physical evidence obtained by means of one of those statements. The appellant does not dispute the sufficiency of the evidence.

I.

On Halloween night, October 31, 1971, the deceased Richard Johnson, residing at 2851 St. Vincent Avenue in the City of St. Louis, was at home with his wife Clara at about 7:40 p. m. Several "trick or treaters" came to their door. At about 7:40 p. m. the door bell rang. Mr. Johnson got up and went to answer the door. He had with him a bowl of candy. Clara Johnson heard the door open, heard no conversation, but "heard a shot." Mrs. Johnson "jumped up and [ran] to the door," saw her husband "lying at the foot of the steps and the bowl in front of him." She looked up and saw three persons running away, "running at an angle . . . toward Nebraska [Ave.] . . . crossing St. Vincent toward Nebraska, and then they disappeared around the corner of the store." Mrs. Johnson remembered seeing "something white but I don't know what it was." She could not tell whether the persons running were male or female, or Black or White. Immediately she called the police. Very shortly Patrolmen Byron Green and James Broyles arrived at the scene, saw Mr. Johnson lying on the ground at the foot of the steps in front of his residence, and Officer Green immediately requested an "urgent conveyance." An ambulance came, and Mr. Johnson was taken to the emergency ward of City Hospital No. 1 by Patrolman Milton Thomas. Before leaving the area, Officer Green spoke to one Robert French. Mr. French testified that on that evening he was parking his car on the same side of the street where the Johnsons lived and heard a "gunshot, a door slam, or something like that." After that he saw "three people running" wearing dark clothes, and one had a hat on his head. The three were in the middle of the street going south. There was about three feet distance between them. He could not tell whether they were boys or girls, but they were wearing dark clothes.

Two days prior to the unfortunate incident, Detective Bob Hawkins of the St. Louis Police Department saw the defendant, Lansing Ross, at "Compton and Vincent" Avenues wearing a "pair of baggy blue jeans, a white big brimmed hat with a black band around it."

Later, on November 2, 1971, Detective Hawkins and Detective Danial Stewart, his partner, went to 3142 LaSalle Avenue, went up to the second floor, and observed on the kitchen table a "white brimmed hat with the black band like Lansing had on." Lansing's mother was standing outside the door, and the detectives saw Ross there. They went inside and took Ross into custody and handcuffed him. They started down the steps from the second story. Officer Stewart went first, then Ross, then Hawk-

ins. But before they got to the bottom of the steps, Ross "bolted from my [Hawkin's] grasp and he [Ross] fell down on Stewart's back falling to the ground stating 'I didn't shoot that man, Jerry Raggs [Wraggs?] did.'" [1] Jerry Raggs is also known as Jerry McMillian who was also tried for this alleged offense.[2] The two officers took Ross, accompanied by his mother, to City Hospital either because there was an "older cut on his head," or because according to Officer Stewart there was "an old laceration in the scalp." Within fifteen or thirty minutes Ross was taken by the two officers to the Juvenile Detention Center in the City of St. Louis. Ross' mother accompanied him. When they arrived at the juvenile court detention center, there were six or seven persons in the detention room—Ross, his mother Rose Marie Ross, Officer Hawkins, one Joe Ledgerwood, a juvenile officer, Edward M. Steinmann, Jr., Assistant Legal Officer of the Juvenile Court, one Van Fields, a juvenile officer, Officer Stewart, and another juvenile officer, Willie May.

In the presence of his mother, either Van Fields or Steinmann advised Ross of his constitutional rights from a form. According to the testimony of Steinmann, the Assistant Legal Officer of the Juvenile Court, at the pre-trial hearing on the motion to suppress statements, Steinmann advised Ross of the "rights that he had." The rights were: "one, he didn't have to make any statement; two, if he did make a statement it would be used against him. He had a right to a lawyer and if he couldn't afford a lawyer the Court would appoint one at no expense to him, and if he did make *a statement and it was used in court, Juvenile Court could send him to a correctional school, possibly."* (Emphasis added). He was, however, not advised that he "could possibly be certified for a

trial as an adult bound over to the Circuit Court to be tried as an adult."

Ross and his mother indicated they understood each of these warnings. No promises or threats were made; Ross was not mistreated. He and his mother signed the forms.

After being advised of these rights, Ross was questioned by Officer Stewart and one of the juvenile officers. Ross made a taped statement which was admitted into evidence in the criminal proceeding. According to Officer Hawkins, "Lansing said that he and a girl by the name of Christine Jackson [later identified as Deborah Tate] and Jerry Raggs [Wraggs] were in front of Christine's house and Jerry Raggs had shown him [Ross] a pistol. . . .[3] He [Ross] said that Jerry Raggs had told them he wanted to go on St. Vincent to get something back that belonged to him. So they went to 2851 St. Vincent, knocked on the door and the man answered the door, went back in and came back with some candy and when he did Jerry Raggs put the pistol to his face and said the old white man grabbed the pistol. He [Ross] said when he grabbed the pistol he and Christine Jackson ran down the steps and started running up St. Vincent. When he did he heard a shot. He looked back and the old white man . . . was fallen and they continued to run."

After this statement made on November 2, 1971, and while in detention, Mr. Joseph Scalise, a deputy juvenile officer with the Juvenile Court, who shared an office with Leo Allston, Jr., conversed with the defendant on numerous occasions. He discussed with Ross the situation that occurred on Halloween night. During this time, "I said a lot of things to him. . . . I asked him what happened. I asked him who it happened with. I asked

1. Officer Stewart testified, " . . . he bolted from my partner and . . . started yelling that he [Ross] didn't shoot the man, that Jerry Raggs shot the man."

2. See State v. McMillian, 514 S.W.2d 528, 1974 (Mo. banc.)

3. Describing it as a ".22 pistol mounted on a frame with .38 white bone handles."

him what weapons were used, where the weapons were. Just about everything I can think of concerning the case." Scalise also indicated to Ross that it would be to his benefit to tell him any information he had about any evidence in the case, and that the police might possibly find Jerry McMillian's fingerprints on the gun.

Then on November 10, 1971, Ross "told me [Scalise] where he thought the gun was hiden [sic] . . . . He told me it was out in the back yard at the house on Caroline. [Jerry McMillian's aunt's house —Mrs. Teague.]" The next day, Scalise, Deputy Juvenile Officer Leo Allston, Jr. and Officer Thomas Parks went to the home of Grace Teague, and, after requesting permission to look in the back yard, which was granted, found between some cross-ties in a brown paper bag a 9 shot .22 caliber revolver. Mr. Allston located the gun. After marking the gun, he gave it to Officer Parks.

The November 10 statement to Deputy Juvenile Officer Scalise and the gun were both introduced in evidence in this trial over objection. Medical records and testimony of a surgeon and pathologist indicated that the cause of death of Mr. Johnson on December 5, 1971, was a "gunshot wound of the brain with abscess formation."

The police officer of the Firearms Identification Section, Paul Reeder, testified the bullet taken at the autopsy and the test bullet of the gun found in Mrs. Teague's yard had the same "land and groove widths" but he could not state positively that the bullet taken in the autopsy was fired from the same gun found in Mrs. Teague's yard.

Throughout this proceeding, first on a motion to suppress statements immediately

before trial and at various intervals during the trial, the defendant Ross objected to the introduction of the two statements, one made on November 2, and one November 10, and objected to the introduction into evidence of the pistol on various grounds: "[F]irstly, Section 211.271[4] of the Juvenile Code . . . specifically states that any admissions or confessions or statements given to any officer of the Juvenile Court cannot be used by the State in the criminal prosecution. . . . [A]ll admissions, confessions, statements by the child to the juvenile officer and the Juvenile Court personnel . . . are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceedings, civil or criminal, other than proceedings under that chapter." But the motion and objections were overruled. During the trial, counsel argued that defendant was not advised of his right to be certified by the Juvenile Court, and he also complained that the weapon introduced was the "fruit of the poisonous tree." He did not complain during the trial that the Miranda rights were not given.

As stated, the jury, after being instructed on murder in the second degree and manslaughter, found the defendant Ross guilty of murder in the second degree and assessed his punishment at twenty-five years in the Missouri Department of Corrections.

After a motion for new trial was overruled, and allocution granted, the court sentenced the defendant in accordance with the jury verdict. Leave to appeal as a poor person was sustained, and defendant appealed to this court on April 2, 1973.

## II.

Appellant contends on this appeal that the Court erred (1) in admitting into evi-

---

4. § 211.271(3) provides: "After a child is taken into custody as provided in section 211.-131, all admissions, confessions, and statements by the child to the juvenile officer and juvenile court personnel and all evidence given in cases under this chapter, as well as all reports and records of the juvenile court, are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, other than proceedings under this chapter."

dence a statement made by the defendant to officers of the juvenile court; (2) in admitting into evidence a statement made by the defendant to a deputy juvenile officer and (3) in admitting into evidence a weapon which was seized as evidence as a result of defendant's statement.[5]

Appellant therefore contends that the court erred in admitting into evidence the statement made on November 2, 1971, to the police and juvenile officers, erred in admitting the statement made to Mr. Scalise on November 10, 1971, and also erred in admitting into evidence the pistol found in Mrs. Teague's back yard.

Appellant argues the statement on November 2, 1971, made before police and juvenile officers is clearly rendered inadmissible in evidence at a criminal proceeding by the language of § 211.271(3) since it prohibits the admission into evidence in a criminal proceeding *all* admissions, statements or confessions made by the child *to* the juvenile officer and *juvenile court personnel.* To admit the statement, he contends, would be "completely inconsistent with and antithetical to the theory and goals of the juvenile code." He contends that § 211.271(3) "must be viewed as being intended by our legislature as a means of furthering the rehabilitation goals of the whole juvenile code. It is intended to foster the . . . concept wherein the child is induced to be honest with the juvenile court personnel without the fear that what he says may later be turned against him and used to convict him as an adult."

As to the second statement of November 10, 1971, appellant argues that this statement is clearly inadmissible under § 211.-271(3). Defendant was in custody and made statements to a juvenile officer—one of the persons enumerated in the statute. "The prohibition of the statute is clear and absolute, that such statements cannot be used in a later criminal proceeding."

Lastly, appellant-Ross contends that the weapon should not have been admitted because there is a "fundamental unfairness in having the juvenile officer [Scalise], who is supposed to be acting to promote the welfare of the child . . . gathering evidence which might be used against the child in a criminal proceeding." This procedure, he argues, undermines the goals of the juvenile code by encouraging a relationship of confidence and then "later putting the child in the position of seeing that relationship as having been turned against him." Such evidence, he argues, should only be used in proceedings under the juvenile code and not in criminal proceedings at a later time.

The respondent-State, on the other hand, contends that the trial court did not err (1) in admitting the first statement under § 211.271 because it was not made to juvenile court personnel, (2) in admitting the second statement to "Mr. Scalice [sic]" since the statement was "harmless because the other evidence . . . was so strong that the jury could not have been swayed by Mr. Scalice's [sic] testimony and appellant could not have been prejudiced thereby," and (3) there was no error in admitting the gun since § 211.271(3) only excludes admissions, confessions, statements and reports and records of the juvenile court. The statute does not include or mention demonstrative evidence, hence the trial court did not err in admitting the weapon.

### III.

◼ The first issue we are called upon to decide is whether the statement made by a juvenile to both police officers and juvenile court personnel after the juvenile is warned of his constitutional rights and while he is under the jurisdiction of the juvenile court and before he is certified for trial in a criminal proceeding is admissible in a subsequent criminal proceeding.

5. The brief does not delineate which statements to which officers were inadmissible and

thus fails to comply with Supreme Court Rules. Rule 84.04.

At the time Ross made his statement on November 2, there were six or seven persons in the detention room at the Juvenile Court including his mother. There is no question that he and his mother were given the Miranda warnings in accordance with In re Gault[6] and that he and she indicated they understood them. He was warned that "if he did make a statement and it was used in court, Juvenile Court could send him to a correctional school, possibly." Neither was warned before the interrogation of the possibility that he might be "bound over to the Circuit Court to be tried as an adult."

The Missouri Supreme Court recently dealt with a case arising from this same incident and which parallels the cause before this court. State v. McMillian, 514 S.W.2d 528, 1974 (Mo. banc). In McMillian, supra, the Supreme Court was presented with the questions whether § 211.271(3) is a bar to the use in a criminal proceeding of any statement or confession made by the defendant while subject to the jurisdiction of the juvenile court and whether the defendant was adequately warned of his constitutional rights. The first issue was discussed and determined in State v. Wright, 515 S.W.2d 421, 1974 (Mo. banc), which held that the statute, § 211.271 (3), is not an absolute bar to the use in a criminal trial under the general law of a statement by a juvenile while subject to the jurisdiction of the juvenile court unless the statement is in fact made to a juvenile officer or other juvenile court personnel.[7] As to the second issue, the defendant contended that the warning given was inadequate in that he was not told that he could be certified for trial as an adult and that any statement could be used against him in that trial. The evidence in *McMillian* is similar to this cause. After the Halloween killing,

the defendant McMillian was apprehended by police officers and immediately taken to the Juvenile Detention Center. On November 2, 1971, a police officer took a statement from McMillian at the Center, in the presence of his mother, other officers and juvenile court personnel. A deputy juvenile officer read a Miranda warning prior to entering the hearing room, and prior to any questioning in the hearing room a legal officer of the Juvenile Court "took a copy of a printed Miranda warning and went over it with Jerry and his mother, explaining in detail his constitutional rights." In explaining the Fifth and Sixth Amendment rights, the legal officer told the defendant McMillian and his mother inter alia that " 'the charge is Assault with Intent to Kill * * *, with shooting a man on Halloween evening, that's what this charge is, and * * * [Jerry] doesn't have to make any statement if he doesn't want to, * * * [b]ut any statement that he does [make] may be used against him. * * * That is[,] if the Juvenile Court finds that he is guilty of shooting the man the court could, among other things, it could send him to a correctional school, it could put him in an institution public or private, it could place him with another person, another guardian so that he wouldn't live with you . . ..' "

The Court held that there was nothing in this explanation of his rights from which it may be said that defendant and his mother should have understood that he had been charged with a criminal offense under the general law and would be tried in another court or that they realized that criminal prosecution could result, that he could be certified and that any statement would be usable against him in that trial. "The explanation is limited to what the juvenile court could do with him based on

---

6. 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

7. " . . . [I]f, after he has been granted his federal constitutional Fifth and Sixth Amendment rights, a juvenile subject to jurisdiction of the juvenile court makes a voluntary statement to someone other than a juvenile officer

or other juvenile court personnel, and if it is made clear to the juvenile that criminal responsibility can result from any statement he makes and that the questioning authorities are operating as his adversaries rather than his friends, such statements are admissible in evidence against the juvenile in a criminal trial." State v. Wright, supra, at p. 430.

charges in juvenile court." The Court also found that an awareness of defendant's potential criminal sanctions may not be imputed merely from his knowledge that police officers were present.

The Court therefore held that on this record it could not conclude that the defendant or his mother realized his potential criminal responsibility when he made the statement because basically the "warning given him was limited to what the juvenile court could do if he made a statement." The court therefore ruled the statement inadmissible and reversed and remanded the cause.

We believe State v. McMillian, supra, controls here. When the defendant Ross was taken to the detention room at the Juvenile Center, the police, juvenile court personnel and his mother were present. Mr. Steinmann, the Assistant Legal Officer testified that he advised the defendant of the rights he had—that he did not have to make any statement, if he did it would be used against him, "and if he did make a statement and it was used in court, Juvenile Court could send him to a correctional school, possibly." Such an explanation as in *McMillian* did not make it clear to Ross or his mother that criminal responsibility could result from any statement he might make.

We, as the Supreme Court in *McMillian*, cannot conclude that on this record, the defendant-Ross or his mother realized his potential criminal responsibility when he made the statement implicating him in the offense. Although Officers Stewart and Hawkins were present and the defendant knew that at the time he made the statement they were policemen, "an awareness of his potential criminal responsibility may not be ascribed to him from this knowledge where, as here, the warning given him by the juvenile court officer was limited explicitly to what the juvenile court could do with him." State v. McMillian, supra.

Therefore, we hold that the statement made on November 2, at the time when Ross was under the jurisdiction of the juvenile court and prior to certification, was, under the circumstances here, inadmissible in the adult criminal proceeding, and we therefore reverse the judgment of conviction and remand the cause for further proceedings.

Defendant would have us require that, before making any statement, a juvenile be advised that he could be certified for trial as an adult in a criminal prosecution and that any statement he may make could be used there against him. In a trilogy of cases, the Missouri Supreme Court en banc has held that this is not required. State v. Wright, supra; State v. Rone, 515 S.W.2d 438, 1974 (Mo.); State v. McMillian, supra.

Although the Court recognized the "desirability" of specifically stating to the juvenile that he could be certified to be tried as an adult and that any statement he made could be used against him, the court held that this was merely one method— "and probably the safest"—of assuring that the juvenile realizes the potential criminal responsibility from his statement. The court directed that the totality of circumstances be examined to determine the juvenile's awareness of the potential results of his statements.

## IV.

■ We turn to the appellant's second point that the court erred in admitting the statement made to deputy juvenile officer Joseph Scalise as to the whereabouts of the gun which was subsequently found on Mrs. Teague's property. The appellant objected to the testimony on the ground that any statement made by Ross is inadmissible under § 211.271(3) and objected to the introduction of the pistol because the "gun is the fruit of the poisonous tree, being found as a result of the statement that was made to the deputy juvenile officer in detention."

The discussion between Ross and Scalise occurred on November 10, 1971, in the ju-

venile court facilities. No one was present but Ross and Scalise. Scalise indicated that it would be to his [Ross'] benefit to disclose his knowledge about the evidence in the case, and that the police might be able to find McMillian's prints on the gun. Ross eventually told Scalise that the gun was in Mrs. Teague's back yard. Appellant contends that the statements to Scalise were clearly inadmissible under § 211.-271(3). The State counters this argument by contending that the admission of "statements made to Mr. Scalice [sic] was harmless, because the other evidence of appellant's guilt was so strong that the jury could not have been swayed by Mr. Scalice's [sic] testimony and hence appellant could not have been prejudiced thereby." We reject the respondent's theory that there was harmless error.

This second statement to Mr. Scalise was made some ten days after the first one to the police and juvenile officers. This statement was made to Mr. Scalise alone in the atmosphere of the juvenile court. Mr. Scalise regarded any statements made by Ross at this time to be "confidential." This statement was made in the context of a relaxed, non-adversary, informal setting. Although the Miranda warnings had been given some ten days earlier, none were given at the time of this second statement.

Under such circumstances we are bound by the specific and explicit language of § 211.271(3)—"After a child is taken into custody . . . all admissions, confessions, and statements by the child to the juvenile officer . . . are not . . . proper evidence against the child and shall not be used . . . in any proceeding, civil or criminal, other than proceedings under this chapter."

In State v. Rone, supra, the Supreme Court stated that the statute, 211.271(3),

does not establish a complete bar to use in a criminal trial of a statement or admission by a juvenile unless the statement in fact is one made to a juvenile court officer or other juvenile court personnel.

The statement concerning the gun was made to the deputy juvenile officer at a time when Ross was in custody in the juvenile system. The *statement* was one concerning the gun that could be found in Mrs. Teague's back yard. Ross was encouraged to speak to the deputy juvenile officer. We cannot fly in the face of this specific expression of our General Assembly, and therefore, hold that the testimony of Mr. Scalise relating to the statement made to him by Ross on November 10, was not admissible.

### V.

■ The third point raised by appellant is that the court erred in admitting into evidence the weapon seized as a result of Ross' statement to Mr. Scalise on November 10, 1971. He argues, "The defendant has urged upon the Court in his previous argument that the defendant's statement, wherein he indicated where the weqpon [sic] could be found, should not be admissable [sic] in evidence in a criminal proceeding. It is now argued that the weapon itself should not be introduced in evidence at a criminal proceeding. . . ."

Appellant at trial objected to the introduction of the weapon because it was the "fruit of the poisonous tree." He contends on appeal that the recovered weapon should not be admissible in the criminal proceeding because it is the illegal "fruit". But his contention is, we believe, misplaced. There is no "poisonous tree"[8] in

---

8. The fruit of the poisonous tree doctrine has had a long history. Beginning with Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920) and Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939) through Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) and Harrison v. United States, 392 U.S. 219 (1968) it has been held that evidence obtained through violation of constitutional rights is not admissible. For a comprehensive discussion of the doctrine, see

the sense that the statement was illegally obtained or evidence unlawfully gathered. The statement made by Ross to Scalise was not obtained illegally or in violation of Ross' Fourth, Fifth or Sixth Amendment rights. We do not here deal with a violation of these rights so that the "fruit" should be excluded. Rather we deal with a statutory exclusion set forth in § 211.-271(3). The issue is whether the scope of the statute prohibits the use of information obtained from a statement made to the juvenile officer only at a time when the juvenile is within the jurisdiction of the juvenile court and prior to certification. Or, in other words, the issue is whether the relationship between the juvenile and the juvenile officer precludes not only the admissibility of a statement under § 211.271(3) but also the "fruits" of that statement. The resolution of this issue, in our opinion, hinges upon the purpose and policy of this statute adopted by the General Assembly.

We believe that the underlying policy and purpose of § 211.271(3) is to allow a juvenile to discuss his problems with the juvenile officer in a relaxed, non-adversary, confidential setting freely, openly and without fear in order that the juvenile officer and juvenile court personnel may attempt to aid the youth in his rehabilitation. The purpose of the statute is rehabilitative in nature. It explicitly precludes the admission of statements in any proceeding other than within the juvenile system. If the purpose and underlying policy of the statute is to be meaningful, and a youth is to be encouraged to discuss his problems freely so that juvenile court personnel may be in a better position to aid the juvenile, we believe that not only the statement made to the juvenile officer, but also physical evidence obtained thereby, such as the gun here, which is not otherwise discoverable from an independent source should also be inadmissible except in the juvenile court system. We therefore hold that when a statement is made to a juvenile officer by a youth within the jurisdiction of the juvenile court as here in a relaxed, non-adversary confidential atmosphere, not only is a statement made inadmissible in a subsequent proceeding, but also physical evidence obtained as a result of such statement which was not otherwise discoverable is also inadmissible in a subsequent criminal proceeding, and should not be used against the youth except within the juvenile court system.

As long as the General Assembly holds to our present juvenile justice system, we believe that not only is the statement to a juvenile officer inadmissible but also the physical evidence obtained from such statement is inadmissible in a subsequent criminal proceeding. The General Assembly has determined that it is in the best interests of the state and a youth within the jurisdiction of the juvenile court that a statement made to the juvenile officer and juvenile court personnel is not admissible in a subsequent criminal proceeding. We believe it logically follows that physical evidence which was not otherwise discoverable by an independent source but which is located as the result of such a statement to the juvenile officer should likewise be inadmissible. § 211.271(3) states that "all admissions, confessions, and statements by the child to the juvenile officer and juvenile court personnel and all evidence given in cases under this chapter . . . are not . . . proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, other than proceedings under this chapter."

We therefore hold that the trial court erred in admitting the pistol obtained as a result of the statement to the juvenile officer, Scalise.

Pitler, "The Fruit of the Poisonous Tree" Revisited and Shepardized, 56 Calif.L.Rev. 579 (1968); 3 Wigmore, Evidence, § 859 (1970) and Annot., "Fruit of the Poisonous Tree Doctrine", 43 A.L.R.3d 385, 406 (1972); Cf. Michigan v. Tucker, 417 U.S. 433, 94 S. Ct. 2357, 41 L.Ed.2d 182 (1974).

## VI.

For the foregoing reasons, the judgment of the trial court is reversed and the cause remanded for further proceedings.

DOWD, C. J., concurs in result.

WEIER and KELLY, JJ., concur.

DOWD, Chief Judge (concurring).

I concur in the result, but respectfully dissent from that portion of the opinion which holds that the gun found in Mrs. Teague's back yard is not admissible as evidence in the criminal proceeding.

I do so for two reasons. First, the gun was located as a result of the conversation between Mr. Scalise and the defendant Ross. He was asked about the gun under circumstances whereby Mr. Scalise said that if Ross told where the gun was, they might find that Mr. McMillian's fingerprints were on the gun so as to exculpate Ross. Under such circumstances, the information was given with the intent and knowledge that the information would be given to the police for their further investigation. Hence, the statement was not intended to be confidential or privileged. Confidential and privileged statements are protected under the law because they are made in circumstances where the speaker believes they will be kept confidential. No such belief can be attributed to this statement. To deny the admission into evidence of the gun would give Ross the "best of two worlds." If McMillian's fingerprints were found on the gun, Ross might be exonerated. If the fingerprints of McMillian were not on the gun, then the gun could not be used against Ross in the criminal proceeding. I find nothing violative of the confidential relationship under these circumstances. Accordingly, I believe that on any retrial the gun should be admissible in evidence.

Secondly, I do not believe the statute 211.271(3) to be violated. The statute expressly confines exclusions to statements and admissions and does not deal with physical evidence.