**In the Matter of David V. BEAR, III, Respondent.**

No. 60459.

Supreme Court of Missouri, En Banc.

April 10, 1979.

Jim J. Shoemake, Michael A. Fisher, St. Louis, for informant.

Walter D. McQuie, Jr., McQuie & Deiter, Montgomery City, for respondent.

SIMEONE, Judge.

I.

This is a disciplinary proceeding pursuant to Rule 5 against David V. Bear III, an attorney licensed to practice in this state. On November 9, 1977, the Advisory Committee charged Mr. Bear with various acts of professional misconduct allegedly contrary to the Code of Professional Responsibility, Rule 4.

The information filed by the Advisory Committee is in four counts:

1. That on or about April 15, 1972, respondent did tamper with evidence in a criminal case by erasure of a tape-recorded interview and interrogation of Larry Lee, a juvenile, by Officer Robert Muse contrary

to DR 1–102(A)(4)(5) and (6) and DR 7–102(A)(1)(6).[1]

2. That subsequent to April 15, 1972, and prior to the preliminary hearing in the case of *State v. Larry Lee*, Respondent did prepare and distribute a "schedule of events" knowing that some portions thereof were false and did distribute copies of said "schedule of events" to potential witnesses in the case of *State v. Larry Lee* to influence said witnesses to testify falsely contrary to DR 1–102(A)(5) and (6).

3. That prior to the preliminary hearing in the case of *State v. Larry Lee*, Respondent did obtain and show to his client, one Victoria Ransom, a picture of defendant, Larry Lee, in order to aid said client in the identification of the defendant, such conduct being impermissibly suggestive to said client well knowing that his client had never viewed the defendant in an identification lineup and had, in fact, made wrongful identification of two other persons in a lineup prior to the arrest of the defendant, contrary to DR 1–102(A)(5) and (6).

4. That in April of 1976, Respondent did engage in discussion of and exploration of a scheme to bribe a public official and furthermore Respondent failed to report the same to proper authorities at the time such discussion occurred, contrary to DR 1–102(A)(4)(5) and (6). The first three counts refer to the "Larry Lee Matter" and the fourth count refers to the "Robert Brown Matter".

The information prayed that Respondent be disbarred and that his right to practice law be terminated. An answer was filed by Respondent. In December, 1977, this court appointed the Honorable J. Donald Murphy as master to hear the evidence and make findings of fact and conclusions of law. A hearing was held February 27—March 2, 1978.

## II.

### *The Larry Lee Matter*

On the evening of April 3, 1972, Miss Victoria Ann McKay Ransom, a student at Stephens College, had just finished doing the news for a radio station at Stephens College and was walking to a friend's house. She noticed two men following her. She picked up her pace, but the two men confronted her. She started running. One of the men shouted, "Stop"; she turned around; he said "I have a gun." She stopped. The man pointed the gun at her; she gave him $1.25. He asked if that was all there was, she said "Yes," and then he shot her in the face. Part of her tongue was severed. The assailants escaped. Miss Ransom was hospitalized. Shortly after the incident, Miss Ransom's father contacted Mr. Bear, the respondent, and requested that he be retained to advise and assist Miss Ransom and to assist the police department in the investigation of the case. The father indicated to Mr. Bear that he had checked with the Chief of Police and the Chief indicated that it was all right. Such a procedure—a private attorney assisting the police—was not "unusual" in this area, although "[i]t wasn't a routine thing, so to speak."[2] Respondent was paid a fee which was not contingent upon results. Mr. Bear in this role assisted the police department in the investigation, gave legal advice to the police, discussed questions and problems with regard to the investigation, and was present or participated in various stages of the investigation or proceeding.

---

1. DR 1–102: "(A) A lawyer shall not: . . . (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. (5) Engage in conduct that is prejudicial to the administration of justice. (6) Engage in any other conduct that adversely reflects on his fitness to practice law."

   DR 7–102: "(A) In his representation of a client, a lawyer shall not: (1) File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another. . . . (6) Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false."

2. The practice of allowing a private prosecutor to participate in the prosecution of a defendant was found later to be fundamentally unfair. See *State v. Harrington*, 534 S.W.2d 44 (Mo. banc 1976).

Police went to the hospital to show pictures to Miss Ransom. A composite drawing was made. On April 14, 1972, warrants were issued for the arrests of Ronnie Eugene Hickem and William Lorenzo Lawson. There was never a return to the warrants, presumably because they were in jail. On that same date a lineup was held in the courtroom of the Boone County Courthouse. Before the lineup, while Miss Ransom was waiting in an anteroom, respondent gave her a general description of two of the six or seven persons who were to be in the lineup without stating their names or positions, but stating that one was "old looking" and one "very tall". He told her to be "very careful" before she selected someone. At the lineup Miss Ransom was very nervous and afraid. According to Miss Ransom she could not visually identify anyone at the lineup, but did identify one of the persons by voice—a man by the name of Taylor. According to one witness, Suzanne Gladney, Miss Ransom did identify one person, but not Lawson or Hickem.

After the lineup and contrary to the fact, Detective Sergeant Robert Muse who was present at the lineup and involved in the investigation, at the suggestion of respondent, told Lawson that he (Lawson) had tentatively been identified in the lineup. During a previous interrogation of Lawson, he mentioned that Larry Lee was involved in the incident. Lawson was released with the understanding that when he was released he was going to obtain, if possible, information from Lee regarding the shooting. Some short time later, Lawson called Detective Muse and informed him that Lee and Dale Quint were involved.

On April 15, 1972, respondent attempted to obtain an arrest warrant from Timothy (Tim) Ann Sloan, an assistant prosecutor. However, the prosecutor declined to seek a warrant for lack of probable cause. Respondent then suggested[3] that Lee and Quint be "picked up" but not to place them under arrest. On the evening of April 15, about 5:30 or 6:00 p. m. Lee was "picked

up" and brought to the police station by Officer Jessie Brown. At that time several police officers, including Detective Palmer and Officer Carroll Highbarger and Sergeant McGrath were present. So was respondent. Detective Muse was not present at that time. Detective Muse was called at home and he went to the station. Before Lee was brought to the station, the respondent obtained his tape recorder from his office and brought it to the station. The recorder would not fit properly in a drawer in the police room so Sergeant McGrath used his tape recorder and placed it in the room where Lee was brought in. According to the respondent Lee was to be informed that he was not under arrest and that he could leave at any time. At the police station, in the presence of one or more officers, Lee was given *Miranda* warnings and was told he could leave. Present were Sergeant McGrath, Mr. Bear, and Detective Carroll Highbarger. After warnings were given, Muse interrogated Lee alone, and the others went to an adjoining room. The interrogation of Lee by Muse was recorded. Muse informed Lee that "Bear was there and that if [Mr.] Lee had not committed the offense, that Mr. Bear would help him." Muse remembered telling Lee that Bear "was there acting on behalf of the Police Department and if he was not involved, he had nothing to worry about, because Mr. Bear would see that he wasn't involved, words similar to that."

After interrogating Lee for 10 or 15 minutes, Detective Muse learned that Lee was a juvenile. The entire colloquy was tape recorded. After learning that fact, Muse went out of the room and talked to Sergeant McGrath or Mr. Bear and told him "we better get ahold of the Juvenile Officer right away, because he just told me he was 16." Arrangements were made to have a juvenile officer, Mr. Homer Thayer, brought to the station. Mr. Thayer arrived. Lee was interviewed again in the presence of the juvenile officer, and a written statement in which he admitted robbing Miss

---

**3.** Although Detective Muse indicated that he "wouldn't say [Mr.] Bear suggested it. [To pick them up] would be standard police procedure, as far as I'm concerned."

Ransom was taken about 8:00 p. m.[4] In this statement Lee stated the gun went off accidentally. That same evening Dale Quint was interrogated.

After the interrogation of Lee on the evening of April 15, either that evening or a day or two later, the respondent erased the tape. According to Detective Muse the tape, except for the statements by respondent Lee, was erased by the respondent the same evening of April 15. But according to respondent it was erased a day or two later. Respondent became "mad" because of the statements made by Muse about his intending to help Lee.[5] According to respondent, the tape was also erased because Lee was a juvenile and the statement on the tape was, in the words of respondent, "absolutely worthless." There was a question in Muse's mind whether this was proper procedure. After erasure, respondent gave the tape to Sergeant McGrath stating: "Ted, you might keep the first part of this tape in the event we ever have to prove to Chuck [prosecutor] that this boy was not arrested against his wishes." Neither Muse nor respondent reported the erasure to the prosecuting attorney.

Several days after Lee was interrogated on April 15, respondent, Highbarger, McGrath and Jessie Brown met, but not by prearrangement, at a lounge—The Velvet Lounge—in a local hotel. There the men talked about the chain of events. Respondent prepared a "schedule of events" which according to Muse "we could all, you know, have the right time and dates down where we could be together on it." "It was just so everyone would have general knowledge as to the chain of events." At the lounge respondent indicated that a preliminary hearing would be coming up so he suggested that the officers discuss it to make certain of the chronology of events. At the lounge respondent wrote out the "schedule of events". He later made photocopies and distributed it to the officers.[6] The schedule of events is a two-page printed chronology of the actions of the police officers and respondent on April 15. The schedule of events follows:

"6:30—Bear goes to court house for warrant. Muse tells Jesse [sic] to see if Lee will come in voluntarily. Ted and Muse leave . . .. (Highbarger not there)

"6:45—Jessie picks up Lee at pool hall. Tells him not under arrest but wants him to come to station to answer questions about shooting. Lee says O.K. But doesn't know anything about it.

"7:00—Jessie brings Lee in. Bear comes in at same time. Ted already there. Muse not there yet. Lee told him not under arrest, told can leave anytime. Lee says will stay and talk. Highbarger comes. Ted gives warning off card. Highbarger introduced as cop, deputy, juvenile officer, investigator, jack of all trades. Ted turns on tape. Bear gives warnings. Larry signs waiver. Muse comes in. Tape unpluged [sic] and removed from room. Every body [sic] but Muse Lee and Highbarger, stays. Highbarger in room in doorway approximately 2 ft. away, from Muse and Lee.

"8:00—Muse takes confession. Lee confesses. Call to Homer Thayer—Thayer comes in."

4. On April 19, 1972, another statement was taken which referred to the gun used in the robbery. He stated that on the night he was arrested he gave the gun to another person—"because it had [sic] went off accidentally and I did not want anything else to do with it." He also stated that on April 19, he was shown the same gun by Detective Muse. This statement was signed by Lee, Lee's father, Detective Muse and Carroll Highbarger, as "Juvenile Officer."

5. Respondent stated a day or two later after thinking about the tape he became "madder and madder" and became upset because of what Muse told Lee about helping him. It was, to respondent, offensive, embarrassing and a lie.

Highbarger testified that respondent told him "you should have heard that tape . . . . I had to erase it. Lee did not want to give a statement. Muse had to talk him into it. Muse had to tell him that I was his attorney."

6. One photocopy [Inf. Exhibit 12] contained deletions and additions to the original. The evidence is inconclusive as to when and by whom these changes were made. Respondent denied making any changes.

This schedule did contain certain inaccuracies. The tape recorder was not unplugged and removed prior to the interview of Lee; according to Highbarger he was not introduced at all, and he was not in the doorway and not two feet from Muse at the time the confession was taken. Muse however testified that the schedule in this regard was an accurate statement. Omitted from the schedule was any reference to the taped confession or the erasure of the tape.[7] Respondent testified that he felt that there were things on it that were incorrect but that it represented the combined recollection of himself and the officers. Muse testified that it was a recordation of the collective recollection of the officers involved. The respondent denied that he suggested to the officers that they should testify falsely or give false evidence in the Lee or Quint cases. A copy of the schedule was later given to the prosecutor by Highbarger. It was never used as a basis for testimony by any witness in any subsequent court proceeding.

In May, 1972 Lee's preliminary hearing was held, Lee previously having been certified for trial as an adult. Miss Ransom was "very reticent" to go to the preliminary hearing. At that time her jaw was "wired up" and she was frightened. She was afraid she would "lose my cool." She indicated to respondent, "I wished—perhaps if I could have a picture of him, not for identification purposes, but just to kind of prepare myself so that when I went in there, that I wouldn't just, you know, freak out at seeing him." About an hour or so before the hearing respondent, having earlier obtained a picture of Lee, showed a picture to Miss Ransom. The picture was not identified in any way. Respondent pulled out the photograph and showed it to her, but didn't say anything. Miss Ransom had always asserted that she could identify the person who shot her. At the hearing she "immediately recognized the young man who shot me."[8] At the hearing she did identify Lee as the person who shot her. When examined concerning the showing of the picture to Miss Ransom respondent admitted that he took a "trial risk" in showing the picture to her. Respondent did not tell her to deny seeing the picture.

On November 13, 1972, Lee having been charged with robbery and assault pleaded guilty to a charge of assault with intent to kill and was sentenced to 15 years. The robbery charge was dismissed.

On January 18, 1974, Lee filed a motion to set aside the judgment and sentence pursuant to Rule 27.26 alleging that the complaining witness had no independent means of identifying him, favorable information was not made available to him and the confession was obtained in violation of constitutional rights. After a hearing, the circuit court made findings of fact and conclusions of law and denied relief holding that the existence of inadmissible confessions and the destruction of the tape are not sufficient to invalidate the guilty plea, that the exhibition of the picture was not sufficient to grant relief because it was not the sole means by which the complaining witness identified the defendant. The Court of Appeals, Western District, reversed. *Lee v. State,* 573 S.W.2d 131 (Mo.App.1978). The court reversed the circuit court and permitted Lee to withdraw his plea. The court held that since no disclosure was made to defense counsel with respect to the misidentification which Miss Ransom had made at the lineup[9] this was a material matter and such nondisclosure was prejudicial.

The master in this proceeding found that respondent tampered with evidence in a criminal case by erasure of the tape-recorded interview and that such conduct violated

7. Muse stated that the schedule fairly portrayed the events as they occurred on April 15 except for the unplugging of the recorder.

8. She stated that he exhibited mannerisms at the hearing which he exhibited the night of the robbery—for example he picked his teeth.

9. The court found that Miss Ransom selected either Hickem and Lawson or Taylor as her assailants. But in the record here there was no such evidence. Some identification of someone was made by voice.

the Code of Professional Responsibility and recommended that he be publicly reprimanded. The Master dismissed counts II and III.

### The Robert Brown Affair

The Robert Brown affair arises out of the representation by respondent of a client, James M. Morris, in April, 1976. Mr. Morris was the owner of J. M. Morris Construction Co. of Kansas City. He desired to build an asphalt plant on a 40-acre tract of land in Boone County. In order to do so it was necessary that the tract be rezoned. Mr. Morris was prepared to expend $500,000 on the project. Mr. Bear was retained to aid in accomplishing the rezoning. Robert E. Brown was, in that year, the presiding judge of the Boone County Court. Mr. Brown and respondent were close friends. There were two other members of the County Court—Judge Carolyn Lathrop and Judge Clarence Drew. Brown was also a member of the Zoning Commission. The proposed rezoning met with opposition from the surrounding land owners. On April 15, 1976, the planning and zoning commission voted unanimously to deny the rezoning. The County Court was to vote on the matter on April 22, 1976. Between those dates, respondent and Brown met twice in Brown's office and discussed how a favorable vote could be obtained before the three-member county court. The testimony as to what occurred in these conversations is in direct conflict.

According to Brown, at the first meeting, respondent came into the office and was "quite distraught." Respondent told Brown that an earlier hearing of the zoning commission had been held at which no vote was taken and there was opposition. Bear told Brown that he thought the community should have the plant. Bear inquired how to obtain the votes of the judges of the county court. There was a general discussion about both judges and how to get their vote. According to Brown, respondent said "Well, I don't know how these things are handled in the county, but . . . I know down at City Hall, all you have to do is put a thousand dollars on the right desk and you can get these things done." Discussion was had on how to obtain Mr. Drew's vote. In the second conversation, according to the testimony of Brown, respondent asked Brown what he thought it would take to make Drew stay home. In that conversation, respondent, according to Brown, stated "Do you think he would do it [abstain] for $10,000?" The substance of Brown's testimony was that it was the respondent who approached Brown about offering money to Drew to influence his abstention from the meeting. Brown testified that he was "pretty sure" respondent was the first one to mention the $10,000 figure.

Respondent's testimony was directly to the contrary. Respondent testified that in the first conversation when it was discussed how to achieve Drew's vote, Brown said "Well, he likes to play.", and that "Clarence has accepted presents for favors before, nothing big, maybe a bottle of whiskey, a case of whiskey . . . ." Respondent said "You mean a bribe?" Brown said, "Well, I don't mean to say it that way," or something to that effect. Respondent then said, "I'm not going to have anything to do with that." "I'm going to get involved in a bribe." Brown suggested that respondent call him later. When respondent did not call, Brown called him and left a message. Respondent then went to Brown's office. At the second meeting, apparently on April 21, the day before the county court meeting, Brown reported that he talked to Drew and that Drew could arrange to stay home. Then "my vote would override the other Judge's vote." Brown said, "Clarence has a bad heart, Dave, and he needs a heart operation. It's going to cost about $10,000 . . .. Clarence is a little hard up for money right now." Respondent then stated that "Bob, I've told you I'm not going to get involved in that" or "have anything to do with that."

According to respondent, following this second meeting he discussed the matter with his partners and later informed Mr. Morris. Mr. Morris testified that as a matter of "factual reporting" that if "we were willing to spend $10,000 that a possible vote on the rezoning might be obtained." Morris

said he didn't want any part of it, and to inform Brown. At that meeting in respondent's office, Mr. Hines, respondent's partner, indicated that under no circumstances would the law firm be involved in this matter. Respondent then placed a call to Brown and advised him of their disinterest.[10]

On April 22, 1976, the Boone County Court voted against the rezoning. Within a few days thereafter, Morris informed a local banker, Mr. Hartley Banks, about the event and expressed his displeasure. Someone, perhaps Mr. Banks, in turn, on April 27, contacted the Circuit Judge who called the prosecuting attorney, Milt Harper. On April 28, Mr. Harper contacted Mr. Morris who told him of the events. On April 29, Mr. Hines, respondent's partner contacted the Secretary of the Thirteenth Judicial Executive Bar Committee, Arthur Oliver, and met with him the next day to discuss the matter. Hines related the information that Brown had in some manner attempted to solicit a bribe and asked whether the event should be filed with the local disciplinary committee or with the prosecuting attorney. Oliver recommended that the matter be disclosed to the prosecuting attorney and that he would discuss the matter with the other members of the committee. Mr. Hines assured Mr. Oliver that he would see that "Mr. Bear went directly to the Prosecutor."

According to the prosecutor, Mr. Milt Harper, Mr. Bear called him on April 29 and Mr. Harper met with Bear the next morning. That morning Bear said he had "something on his mind" but did not want to go into all the details because he wanted to "tell the story" to him and to Mr. Oliver. He said it involved an offer of some type; but that Judge Brown "was clean." [11]

At about 3:30 p. m. that same day, respondent and his attorney met with Harper and gave his version of the affair.

Mr. Brown was subsequently indicted by the grand jury. There were two indictments totalling five counts—three counts of perjury before the grand jury, one count of subornation of perjury and one count to influence a witness. Respondent was the principal witness before the grand jury. Subsequently, as a result of a plea bargain, Brown entered a plea of guilty in Camden County to a two count substituted information charging oppression in office, a misdemeanor, and was fined and placed on probation.

Respondent testified that between April 21 and 28 he was out of town involved in various cases; that he could have picked up the telephone from Brown's office on April 21, the date of the second meeting with Brown but—

". . . [M]y God, this guy was a close friend. His wife was probably my wife's closest friend. I knew what my reporting of him was going to do, if not to him, most likely to me. And I didn't view it at all with pleasure. If there was any way in the world I could have turned so it never happened, I would have done it."

As to this count, the master recommended that it be dismissed.

### III.

In this type proceeding, the findings and conclusions of the master are advisory and it is the duty of this court to review the evidence. The credibility, weight and value of the witnesses and the determination of all fact issues are for this court. *In re Schiff*, 542 S.W.2d 771, 772 (Mo. banc 1976). The charges must be sustained by a preponderance of the evidence. *Matter of Duncan*, 541 S.W.2d 564, 569 (Mo. banc 1976).

### The Erasure of the Tape

The issue arises as to whether the erasure of the recorded interview of Lee constitutes

---

10. Morris testified that "Dave informed Bob Brown of what I had said, that we were not interested in this particular offer and I would have assumed from the conversation that Brown was inquisitive as to why and was more or less persuading Dave that we should do this thing."

11. Respondent denied that he said that Brown was not involved and denied using the word "clean"—according to respondent Harper asked whether Brown tried to "bribe you" and respondent said "No, that's not exactly it, but I want to wait until Art Oliver is here."

unprofessional conduct in violation of the disciplinary rules of the Code of Professional Responsibility.

Under the decisional law at that time, the statements made on the tape by Lee to Detective Muse may well have been inadmissible for several reasons. The statement was taken before Lee was taken to a juvenile court, no juvenile officer was present, no parent was present and full warnings were not given.[12] See *Arbeiter I*, 408 S.W.2d at 30.

However, in this case, the respondent held a special status; he was an advisor to the police department in an on-going investigation of a criminal case; he was an advisor and confidant of the victim. The motives which respondent had in intentionally erasing the tape were varied—he was angry at what Muse had told Lee about respondent helping Lee; the statement was not evidence and was "worthless"; he was embarrassed because of the "lie" told to Lee. Whatever the motives the fact is that respondent did intentionally erase the tape.

The tape may well have proved to be inadmissible or "worthless" in any subsequent proceeding; but, it was a "statement" by the defendant, it was "evidence" in a criminal proceeding; it was subject, at the time, to discovery (Rule 25.195, effective 1965); and it may have tainted the two subsequent confessions of Lee. *Cf. Wright*, 515 S.W.2d at 427. While the inferences are contrary, it also may have contained exculpatory matter beneficial to Lee. The point is that in these special circumstances it was not respondent's prerogative to make these determinations. Those determinations are for a judicial officer to make and not respondent. The fact is that the tape was "evidence" in a criminal proceeding. There was an on-going criminal case with Lee as the focus of the investigation, and in such circumstances, for whatever motive, the respondent made the determination to erase the tape.[13] Because of his special status and under the circumstances, we cannot condone this intentional erasure of the tape, and although not malicious, respondent engaged in conduct in violation of the Code of Professional Responsibility by "tampering" with "evidence" in a criminal case. DR 1–102(A)(5). It has generally been held that an attorney's destruction of evidence which he knows may be required upon a trial or judicial proceeding constitutes a breach of professional duty and subjects him to discipline. See Annot., 40

12. Under the decisional law at that time a confession to police by a juvenile taken before he is taken to the juvenile court was and is inadmissible. *State v. Arbeiter*, 408 S.W.2d 26 (Mo. 1960) [*Arbeiter I*]. See later decisions *State.v. Reagan*, 427 S.W.2d 371 (Mo. banc 1968) [*Arbeiter II*]; *State v. Arbeiter*, 449 S.W.2d 627 (Mo.1970)—statements made to juvenile officer without warning after certification inadmissible. [*Arbeiter III*].

In *State v. Sinderson*, 455 S.W.2d 486 (Mo. 1970)—statement made to officers in presence of juvenile officer and mother with warnings held admissible where the setting was not a relaxed, nonadversary parens patriae situation.

Several decisions followed *Sinderson*. In *State v. Wright*, 515 S.W.2d 421 (Mo. banc 1974) it was held that if after he has been granted his federal constitutional Fifth and Sixth Amendment rights, a juvenile subject to jurisdiction of the juvenile court makes a voluntary statement to someone other than a juvenile officer or juvenile court personnel, and if it is made clear to the juvenile that criminal responsibility can result from any statement he makes, and if the questioning authorities are operating as his adversaries rather than his friends, such statements are admissible. *Wright* also held that a second confession is not necessarily tainted because of a previous one. See also *In Interest of A. D. R.* [*Rone*], 515 S.W.2d 438 (Mo. banc 1974)—statement to police in presence of juvenile officer after warning that statement could be used in criminal trial admissible (desirability to inform that juvenile may be certified); *State v. McMillian*, 514 S.W.2d 528 (Mo. banc 1974)—statement inadmissible where warning to juvenile and mother indicated juvenile may be charged with a criminal offense; *State v. Ross*, 516 S.W.2d 311 (Mo.App.1974)—statement inadmissible when explanation did not make clear that criminal responsibility could result.

13. *Cf. United States v. Bryant*, 142 U.S.App. D.C. 132, 439 F.2d 642 (1971) where tape recording by officers of conversations taking place in next room regarding sale of narcotics was not preserved because officer never intended tape to be used in evidence, the court of appeals remanded for a determination of the degree of bad faith and the importance of the evidence lost.

A.L.R.3d 169–193 (1971); *In re Ryder*, 263 F.Supp. 360 (D.C.Va.1967).

We agree with the master, however, that a reprimand is sufficient in this instance and such a reprimand will serve the ends of justice. Lee pleaded guilty, and as things turned out the erasure did not affect his rights. The erasure took place several years before the information was filed against respondent. The erasure was done with a conviction that the tape was wholly inadmissible and embarrassing. Under these circumstances, reprimand will serve the ends of justice.

### The Schedule of Events

The informant contends that the master erred as to Count II in finding that there was not sufficient evidence to prove that the "schedule of events" was used to influence witnesses to testify falsely. We agree with the findings of the master in this regard and dismiss this count.

As to Count II, we believe that there was not a preponderance of the evidence to show that respondent prepared the schedule of events to influence the witnesses to testify falsely. The officers and respondent had no planned meeting at the Velvet Lounge. The manner in which the document was prepared does not indicate it was an attempt to influence the witnesses on how to testify. It was a combined recollection of events. Respondent met several of the police officers in a public place. Over refreshments, he wrote down a summary of the events; the document indicated more emphasis on the sequence rather than the substance of the events. Both respondent and Muse testified that the schedule reflected the collective recollection of those present. There are some inaccuracies in the document, one of which was significant: the tape was not unplugged. But while there were inaccuracies, and some omissions or mistakes, the preponderance of the evidence is not such that it was used to or intended to influence the officers to testify falsely. The schedule was never used as a basis for subsequent testimony in any criminal proceeding, and there is no proof of resultant prejudice to anyone. We agree with the master that the schedule of events is not a basis for disciplinary action. Count II is dismissed.

### The Showing of the Photograph

As to Count III, the testimony of Miss Ransom establishes that respondent's conduct in showing her a picture of Lee some short time before the preliminary hearing was not so impermissibly suggestive so as to give rise to a substantial likelihood of irreparable misidentification. The linchpin of identification testimony is reliability. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977); *State v. Rutledge*, 524 S.W.2d 449 (Mo.App. 1975). Some time before the preliminary hearing in May, 1972, Miss Ransom requested respondent to show her a picture of the person charged as her assailant. At the time she was upset and suffering physically. She told respondent she was frightened and reluctant to appear at the preliminary hearing and asked respondent if she could see a picture "not for identification purposes, but just to kind of prepare myself so that when I went in there, that I wouldn't just, . . freak out at seeing him." She had not previously viewed Lee but always asserted she could identify the person who shot her. About an hour before the hearing respondent showed Miss Ransom a photograph of Lee which he had obtained from Detective Muse. At the hearing, Miss Ransom identified Lee as her assailant. She was the only witness and was not cross-examined. Respondent said nothing to her when he showed her the picture. Although he admitted there was a trial risk, he did not tell her to deny having seen it. Respondent did not initiate the action.

Under these circumstances we cannot conclude that by the showing of the picture that the respondent violated DR 1–102(A)(5) or (6). Count III is dismissed.

### The Robert Brown Affair

As to the Robert Brown matter, we conclude that respondent is not in violation of the Code. Respondent was charged with

engaging in discussion and exploration of a scheme to bribe a public official and "furthermore" in failing to report the same to proper authorities. The testimony and evidence on this charge was completely contradictory—Brown indicating that respondent initiated the solicitation of a bribe and respondent testifying that it was Brown who suggested it. The informant did not contend that respondent conspired with Brown and the evidence does not support such a finding. The issue turns on one of credibility as to whether respondent engaged in discussion and exploration of a scheme to bribe a public official. Brown was the only witness to testify that respondent suggested the scheme to bribe Judge Drew. His testimony is made somewhat suspect by his subsequent plea of guilty of oppression in office in Camden County. There was no testimony from other witnesses that respondent engaged in discussion and exploration of a scheme to bribe Judge Drew with intent to influence his vote. Respondent related the matter the same day to Mr. Morris and his partners. Upon the whole record, and especially in view of the plea by Brown, we hold that the preponderance of the evidence did not show that respondent violated the Code.

Neither can we say that respondent failed to timely report the same to proper authorities. Failure to report must be construed as a failure to report within a reasonable time after the solicitation and not necessarily instanter. Taking April 21, as the date of the initial solicitation, respondent officially informed the prosecuting attorney within nine days thereafter. Before that he told his partners and several other persons. His partner, Mr. Hines, made an appointment on April 29, with the secretary of the disciplinary committee and on April 30 conferred with him. Respondent testified that he did not see the prosecutor until the 29th because of his work schedule. He gave as a further reason that his close friendship with Brown caused him agony. While there are circumstances tending to

show that respondent made no effort to report the solicitation until after the matter had become known, the fact is he did report it to the proper officials within a reasonable time.

We agree with the master that Count IV should be dismissed.

## IV.

█ The respondent at the time of the hearing was thirty-five years old and a member of the Bar since 1969. At the time of the Larry Lee matter he had been an attorney for less than three years. He is associated with an established firm. Twenty-one character witnesses including fifteen attorneys, one banker-mayor, a former mayor, one probate-magistrate, two circuit judges, and one appellate judge testified as to his good reputation for competence, honesty and reliability.[14]

In view of all the testimony and evidence in this proceeding we believe that under Count I of the information respondent should be reprimanded and that Counts II, III and IV should be dismissed.

## V.

█ The main purpose of a disciplinary proceeding is to inquire into the fitness of an attorney to continue in the practice of law. The objective is not to punish the attorney but to protect the public and to protect the integrity of the profession and the courts. *In re Randolph*, 347 S.W.2d 91, 109 (Mo. banc 1961). "Disbarment is the extreme measure of discipline and should be resorted to only in cases where the lawyer demonstrates an attitude or course of conduct wholly inconsistent with approved professional standards. To disbar it should be clear that he [or she] is one who should never be at the bar; . . . For isolated acts censure, public or private, is more appropriate." *In re Sullivan*, 494 S.W.2d 329, 334 (Mo. banc 1973).

---

14. One lawyer indicated respondent did not enjoy a favorable reputation for veracity and honesty. Another lawyer indicated that a substantial number of lawyers considered his reputation for fair dealing "bad".

The court commends counsel on both sides for their work in this case which was performed in a professional manner. Their services were in the finest traditions of the Bar. The court also expresses its appreciation to the special master for conducting the hearing and filing his excellent report.

As to Count I, the respondent is reprimanded. As to all other counts the respondent is discharged.

MORGAN, C. J., BARDGETT, DONNELLY, RENDLEN and SEILER, JJ., and WELBORN, Special Judge, concur.

WELLIVER, J., not sitting.